[No. 960-2.   Division Two.   October 19, 1973.]

HARVEY J. MERRIMAN, *Appellant,* v. JOEL H. TOOTHAKER
*et al., Respondents.*

*William J. Rush* (of *Rush & Hayes*), for appellant.

*Grant Armstrong* (of *Murray, Armstrong & Vander-Stoep*), for respondents.

PEARSON, C.J.—Plaintiff, Harvey J. Merriman, filed suit claiming medical malpractice against the defendant-physician, Joel H. Toothaker. He appeals from a judgment of dismissal following an order of involuntary nonsuit granted at the conclusion of his case-in-chief. Our review of the testimony convinces us that an issue for the jury was presented on one of the two theories asserted.

The factual evidence was largely undisputed. On February 23, 1968, Dr. Toothaker, a specialist who limits his practice to pediatrics, was on emergency call at Centralia General Hospital. Plaintiff, age 16, was admitted to the

hospital at 10:30 p.m. seeking emergency care for injuries sustained in an automobile accident. Defendant treated and sutured certain facial lacerations, and because of marked tenderness in plaintiff's neck and shoulder ordered X rays to be taken of those areas. Defendant reviewed the X rays, was unable to detect any sign of bony injury, and concluded that plaintiff had sustained a bruised and sprained neck. This diagnosis was communicated by the defendant to plaintiff's father. Plaintiff was placed in traction and remained hospitalized in Centralia until discharged at noon on the following day.

The discharge instructions given by defendant to plaintiff's father were to the effect that plaintiff had sustained a badly sprained 'and bruised neck which would be "pretty sore"; that he should be put to bed upon his return to his home at Morton, Washington; that the bed should be made "solid" by use of a piece of plywood; that he should not use his neck until it improved; and that he should consult his family doctor for removal of the stitches "or if anything else developed."[1]

Customarily, the hospital has all X rays read by a radiologist. Accordingly, the February 23 X rays of plaintiff's neck were reviewed by Dr. Mikkelsen, a radiologist from Olympia. His report was received by defendant on February 27, 1968. That report concluded "Anterior compressions at C5 and C6 with local kyphosis—which means curving, and ligament damage dorsally permitting widening of the C5 and C6 posterior articulations. No abnormality at dorsal levels."

Dr. Toothaker testified that on that same day, February 27, 1968, he mailed a copy of the radiology report, together with the Centralia General Hospital clinical records, to Dr. Daniel Hogberg (plaintiff's attending physician) to the Morton Hospital, where Dr. Hogberg's clinic and office

---

[1] We are using the version of this testimony advanced by plaintiff's father, inasmuch as plaintiff is entitled to have the evidence and inferences thereon interpreted in a light most favorable to him. *Moyer v. Clark*, 75 Wn.2d 800, 454 P.2d 374 (1969).

were situated. The covering letter which accompanied those documents is set forth in the margin.[2] No other communication occurred between Dr. Toothaker and Dr. Hogberg or the Merrimans.

For some unexplained reason, Dr. Hogberg never saw the letter or the enclosures, although such records would ordinarily be placed upon his desk on the day he was to see the patient. Those documents did become a part of the Morton Hospital records at some undetermined time.

Plaintiff saw Dr. Hogberg on February 26 and was then holding his neck in a stiff, rigid position. Dr. Hogberg was informed that X rays had been taken at Centralia and that there were no fractures. Dr. Hogberg testified, "I let it go at that." It was too early to remove the sutures and plaintiff was instructed to return on February 28. On that day Dr. Hogberg's nurse removed them.

After 2 or 3 days at home, plaintiff returned to school. In the ensuing days, the only treatment he had was unprescribed and consisted of neck massages and manipulations performed by his stepmother.

A day or two prior to March 11, a noticeable swelling developed in plaintiff's lower neck region, and he could not hold up his head. He consulted Dr. Hogberg on March 11, 1968, and was immediately hospitalized. Later a fusion operation was performed in Seattle by Dr. Roscoe Mosiman, an orthopedic specialist, and because of neurological complications following that surgery, an additional surgery to remove a herniated disc was performed by a neurosurgeon.

Plaintiff asserted two theories of liability against defendant: (1) his failure to correctly interpret the X rays; and (2) his failure to communicate the x-ray diagnosis to the

---

[2]The undated letter stated: "Re Harvey Merriman, This young fellow who said he has been your patient was admitted overnight to Centralia General Hospital on 2/23/68. He should be seeing you at the end of the week for suture removal from the frontal scalp. He was placed in traction overnight with considerable relief of the neck pain and sent home on Darvon 65, and Soma compound. The x-ray report concerning his neck injury is enclosed and may need further treatment."

attending physician by telephone when he received it from the radiologist.

Our review of the medical opinion evidence interpreted in a light most favorable to plaintiff convinces us that the trier of fact could conclude with reasonable medical probability:

(1) Had the x-ray report of the radiologist been acted upon and proper treatment instituted before March 9, 1968, the complications which occurred would "probably" have been avoided. (Doctors Hogberg and Mosiman testified in substance to this conclusion.)

(2) Because of the medical significance of the x-ray report and the great danger to the plaintiff if his neck was not immobilized, the community medical standards of that area would require telephone communication to Dr. Hogberg by Dr. Toothaker of the x-ray diagnosis. (Dr. Hogberg testified in substance to this standard.)

■ Our further review of the medical opinion evidence convinces us that plaintiff failed to establish a jury question against defendant for his failure to correctly interpret the X rays. Plaintiff established no medical standard with regard to this theory. In fact the testimony produced established that it required the skill of one experienced in radiology to discern the fractures because of their location and the poor quality of the film. Failure to establish a medical standard applicable to defendant's class of physicians is fatal to a claim of malpractice where the subject matter requires expertise. *See Pederson v. Dumouchel,* 72 Wn.2d 73, 431 P.2d 973, 31 A.L.R.3d 1100 (1967); *Douglas v. Bussabarger,* 73 Wn.2d 476, 438 P.2d 829 (1968). X-ray interpretation is certainly a medical and not a lay subject. *See Rudick v. Prineville Memorial Hosp.,* 319 F.2d 764 (9th Cir. 1963). Accordingly, it was not error to dismiss or refuse to instruct the jury on this issue.

However, the inferences from the testimony of Dr. Hogberg construed favorably to plaintiff do, in our opinion, create an issue for the jury on the failure of defendant to

promptly telephone the x-ray diagnosis to plaintiff's attending physician.

In support of the dismissal by nonsuit, defendant urges that both doctors, on cross-examination, testified that mailing the x-ray report to Dr. Hogberg was good medical practice and that Dr. Toothaker had a right to rely on the attending physician's taking appropriate action "assuming that" he received the records. But the testimony was that Dr. Hogberg did not, in due course, receive the records. The reason he did not see them was not established and we consider the reason immaterial. The fact that Dr. Hogberg did not receive the x-ray report adds weight to his opinion, that because of the serious implications of the report,[3] a personal contact was required to insure prompt action. Dr. Hogberg's testimony established a standard of care sufficient to submit this issue to the jury.

Defendant also challenges the sufficiency of the opinion evidence to establish proximate causation. According to the testimony of Dr. Mosiman on cross-examination, the original injury was admittedly a severe one which could have resulted in the complications which occurred even had proper treatment been given from the outset.

■ It is axiomatic that to establish causation between the liability-producing situation and the claimed injuries or subsequent condition, the medical testimony must reasonably exclude, as a probability, every hypothesis other than the one relied on to remove it from the realm of speculation or conjecture. *O'Donoghue v. Riggs*, 73 Wn.2d 814, 824, 440 P.2d 823 (1968). The testimony must be sufficient to establish that the injury-producing situation "probably" or "more likely than not" caused the subsequent condition, rather than that the accident or injury "might have," "could have," or "possibly did" cause the subsequent condition. *Ugolini v. States Marine Lines*, 71 Wn.2d 404, 407, 429 P.2d 213 (1967).

---

[3]Dr. Hogberg testified that because of the obvious instability of plaintiff's neck, he was in grave danger of being paralyzed from the neck down.

The medical testimony in this case achieved the required level of certainty to establish proximate causation between the failure of defendant to personally notify Dr. Hogberg of the serious x-ray implications and the complications which occurred because immobilization was not promptly accomplished.

At one point Dr. Mosiman testified: "so it's impossible for me to say whether or not the surgery would have been necessary although I feel it was *more likely* to be necessitated by not having the initial immobilization." (Italics ours.)

At another point this series of questions and answers was elicited from Dr. Mosiman:

Q Was the prospect of that disc rupturing any greater on the 11th of March as opposed to the 23rd of February, with reasonable medical certainty?
A I think you can say it is *much more likely*.

. . . .

Q With reasonable medical certainty, what were the probabilities that the disc would not have ruptured?
A Well, let me understand this, if this boy had been treated in traction initially, and maintained in traction, then it would have been *much less likely* to have ruptured.
Q That is with reasonable medical certainty?
A Yes.

(Italics ours.) The fact that the doctor refused to testify in terms of absolute certainty and the fact that he acknowledged on cross-examination that the question was "iffy" may affect the weight of the testimony. It does not, however, nullify the opinion as set forth above.

No medical opinion on a question of this kind is susceptible of scientific precision and there will always be an "iffy" element involved. However, if in the physician's expert judgment, the causal relationship is probable or more likely than not, the quality of the evidence rises above speculation and conjecture and may be considered by the trier of the fact. *Ugolini v. States Marine Lines, supra.* Read as a

whole, Dr. Mosiman's testimony was sufficient to establish the necessary causal relationship.

Lastly, defendant contends that plaintiff failed in his burden of segregating or allocating the damages sustained, as between the original injury and those by reason of defendant's claimed negligence. Reliance is placed upon *Smith v. Rodene*, 69 Wn.2d 482, 418 P.2d 741 (1966) and *Scott v. Rainbow Ambulance Serv., Inc.*, 75 Wn.2d 494, 452 P.2d 220 (1969).

In *Fugere v. Pierce*, 5 Wn. App. 592, 490 P.2d 132 (1971) we gave full consideration to the question of apportionment where the acts of independent tort-feasors combine in rapid succession to produce a single end result. We there held that joint and several liability will attach unless there is substantial proof as to what damage was caused by each act. The burden of proving that the harm is capable of apportionment and can be allocated with reasonable certainty is, we held, upon a defendant seeking apportionment.

In *Fugere v. Pierce, supra,* we distinguished *Scott v. Rainbow Ambulance Serv., Inc., supra,* because that case involved a single injury claimed to be caused by a tort-feasor and substantially contributed to by the plaintiff. We distinguished *Smith v. Rodene, supra,* because of the wide separation in time between the two collisions in which plaintiff was involved.

We think that the *Scott* and *Smith* decisions are also distinguishable from the instant case for the same reasons given in *Fugère.* However, we do not find it necessary to determine whether joint and several liability principles discussed in *Fugere* are applicable to this case. In our view, the proof was sufficient in law to permit the jury to apportion the damage.

There was medical testimony which, if believed, would establish:

(1) had proper treatment been initially administered, plaintiff would have remained hospitalized for 6 weeks and for another 3 months would have required the use of a neck support;

(2) the surgeries, with their attendant expense, would not have been necessary; and

(3) plaintiff would have recovered without the loss of neck mobility which the fusion operation created.

The reasonable cost of the surgeries and hospitalization was before the jury, together with a means of ascertaining the course and extent of recovery had plaintiff received prompt and proper treatment. This was a sufficient basis for the jury to estimate the extent of loss as between the two causes.

In no personal injury case does the law furnish the jury with any fixed standards for measuring pain, suffering, and disability. *See* WPI 30.01, 6 Wash. Prac. 145 (1967). The testimony offered here was at least sufficient under a theory of aggravation to warrant submission to the jury. WPI 30.17, 6 Wash. Prac. 164 (1967).

Judgment reversed and remanded for a new trial.

PETRIE and ARMSTRONG, JJ., concur.