[No. 26646-0-III.   Division Three.   October 16, 2008.]

PATRICIA KAY ROUNDS, *Individually and as Personal Representative, Appellant,* v. NELLCOR PURITAN BENNETT, INC., ET AL., *Defendants,* PROVIDENCE YAKIMA MEDICAL CENTER ET AL., *Respondents.*

*David R. Hevel*, for appellant.

*Jerome R. Aiken* (of *Meyer, Fluegge & Tenney, PS*), and *David A. Thorner, Megan Murphy*, and *Bryan G. Evenson* (of *Thorner, Kennedy & Gano, PS*), for respondents.

¶1 BROWN, J. — Patricia Kay Rounds, as surviving spouse and personal representative for her husband's estate, appeals the summary dismissal of her medical negligence claims against Baljit K. Sharma, MD, and Providence Yakima Medical Center for the death of her husband, Alan D. Rounds, when a tracheostomy tube failed after heart surgery performed by Dr. Sharma at Providence. Ms. Rounds

contends the trial court erred in deciding she failed to show causation. We disagree and affirm.

FACTS

¶2 The facts are drawn most favorably for Ms. Rounds as the nonmoving party under our summary judgment standard of review. *See Korslund v. Dyncorp Tri-Cities Servs. Inc.*, 156 Wn.2d 168, 177, 125 P.3d 119 (2005).

¶3 After his February 5, 2003 heart surgery by Dr. Sharma at Providence, Mr. Rounds suffered from numerous existing and developing complications, including a fungal infection leading to multiorgan system failures. Important here, Mr. Rounds' respiratory problems required ventilator support, initially received by a mouth-to-lungs endotracheal tube. Mr. Rounds' likelihood of survival was about 20 percent before the critical events described next.

¶4 On March 12, 2003, Dr. Sharma performed a trachea-to-lungs tracheostomy procedure on Mr. Rounds using a tracheostomy (trach) tube with an inflatable cuff designed to prevent air escape. Dr. Sharma did not utilize "stay sutures"[1] when placing the trach tube. After he completed the procedure, Dr. Sharma verified the trach tube was working correctly. According to Dr. Sharma, he inflated the trach tube cuff to the minimum occlusive pressure needed to form a tracheal seal. Although no measurements were taken at that time, Dr. Sharma was satisfied he had inflated the cuff to its proper level.

¶5 Following the procedure, cuff pressure was checked by respiratory therapist Brian Trombley. According to Mr. Trombley, the pressure in the cuff should be the minimum amount needed to maintain a seal. The cuff pressure measured 60 centimeters of water at 8:05 p.m. on March 12, 2003, and 55 centimeters of water at 2:50 a.m. on March 13,

---

[1] "Stay sutures" are long sutures, approximately 8 to 10 inches long, placed on either side of the trachea that, when pulled, lift the trachea to the surface. A long thread is tied to the suture and then taped to the chest wall.

2003. Mr. Trombley stated the figure of 60 represented what was necessary to maintain a seal. No evidence shows any adjustment. Further, when Mr. Trombley checked the pressure in the cuff at 2:50 a.m., it was not leaking.

¶6 At about 5:40 a.m., nurses Brad Trisler and Joe Loera began moving Mr. Rounds for bathing when Nurse Trisler heard air coming from around the trach tube cuff and he concluded the cuff was leaking. Mr. Trombley unsuccessfully attempted to put air into the cuff, via a balloon. Mr. Trombley concluded a leak was present either in the cuff or in the tube connecting the cuff to the balloon. Mr. Trombley could not tell where the air was coming from but opined it was probable that air was coming out at the cuff. Regan Wylie, MD, and John S. Barany, MD, arrived and attempted to reintubate Mr. Rounds. While Dr. Barany was able to connect an endotracheal tube, Mr. Rounds' heart stopped and he died. His immediate cause of death was the lack of air to his lungs.

¶7 On March 10, 2006, Ms. Rounds sued Providence and Dr. Sharma, and others not relevant to this appeal, for negligence. Ms. Rounds alleged both Providence and Dr. Sharma failed to follow the accepted standard of care while treating Mr. Rounds. The parties asked the court to consider cross-motions for summary judgment.

¶8 Ms. Rounds argued against Providence that Mr. Trombley negligently caused or permitted the trach tube cuff to be overinflated, causing it to rupture, and negligently failed to inform a physician of the high cuff pressure. Ms. Rounds alleged that Dr. Sharma breached the standard of care by failing to utilize stay sutures when placing the trach tube, and by using a too-small trach tube. Ms. Rounds eventually agreed she could not provide proof that Dr. Sharma used an incorrect size of trach tube.

¶9 Providence argued Ms. Rounds could not establish Providence's actions were a proximate cause of Mr. Rounds' death, because (1) if Mr. Rounds had not died due to the trach tube leak, he soon would have died more probably than not of multisystem organ failure and (2) no expert

testimony established that had Mr. Trombley informed a physician of the trach-cuff pressure, the outcome would have changed.

¶10 Dr. Sharma argued Ms. Rounds could not establish proximate cause because she was unable to show that but for Dr. Sharma's acts, Mr. Rounds would have survived. Dr. Sharma asserted Ms. Rounds presented no evidence showing the lack of stay sutures proximately caused Mr. Rounds' death, and no evidence showing Mr. Rounds' death would not have occurred had Dr. Sharma used a different trach tube.

¶11 In response, Ms. Rounds presented the medical-expert deposition evidence of Jeffrey R. Simons, MD, Luther F. Cobb, MD, and Dr. Gautam. Dr. Simons could not say if the cuff ruptured or was dislodged and agreed that either happening was just as probable. When asked questions about trach size, positioning, and 60-pressure cuff problems, Dr. Simons summarized by saying, "[w]e don't know. All of this is speculation because no one was called." Clerk's Papers (CP) at 204-05. Dr. Simon allowed that if the cuff was positioned correctly and cuff pressure was 60 centimeters of water, 72 hours was an appropriate waiting time before operating to replace a trach tube.

¶12 Dr. Cobb opined that had stay sutures been used, the outside threads would be self-explanatory to Dr. Wylie for use to reposition a dislodged or misplaced trach tube as a matter of "logical deduction rather than speculation." CP at 226. Dr. Cobb testified, "I think it's probably more likely that the tube was displaced than the cuff failed." CP at 91. On the other hand, Dr. Wylie testified she was not trained to use stay sutures when doing emergency tracheostomies, and had they been present, she testified, "I'm not sure how I would have utilized them." CP at 125. After reviewing a medical article discussing stay sutures in tracheostomy procedures, Dr. Wylie answered that it would be "difficult to say" if they could have been utilized to help Mr. Rounds. CP at 339.

¶13 In his deposition, Dr. Gautam opined the trach tube cuff ruptured on cartilage exposed by necrosis of the surrounding soft tissue, and "as the neck of the patient was moved, it led to the cuff being poked, being perforated by the sharp edge of the tracheal cartilage, or maybe cartilages." CP at 208. Dr. Gautam acknowledged that in order to determine whether necrosis occurred in Mr. Rounds, an autopsy was necessary, and one was not done. Dr. Gautam further acknowledged no evidence showed necrosis.

¶14 The court granted Providence's summary judgment motion, ruling (1) Ms. Rounds could not establish proximate cause in her claim against Providence for Mr. Trombley's failure to inform a physician of the pressure in the tracheostomy cuff and (2) insufficient evidence existed to raise a material issue of fact as to the liability of Mr. Trombley for negligently causing the tracheostomy cuff to be overinflated, because no evidence showed Mr. Trombley ever inflated the cuff. The court granted Dr. Sharma's summary judgment motion, ruling Ms. Rounds failed to show sufficient evidence of proximate cause regarding Dr. Sharma's failure to utilize stay sutures. After Ms. Rounds unsuccessfully sought reconsideration, she appealed.

## ANALYSIS

### Summary Judgment

¶15 The issue is whether the trial court erred in deciding Ms. Rounds failed to show proximate cause when granting summary judgment to Providence and Dr. Sharma.

¶16 We review de novo summary judgment grants, engaging in the same inquiry as the trial court. *Colwell v. Holy Family Hosp.*, 104 Wn. App. 606, 611, 15 P.3d 210 (2001). "A motion for summary judgment will be sustained if no genuine issue of material fact exists, viewing the evidence in a light most favorable to the nonmoving party." *Id.* (citing CR 56(c); *Marincovich v. Tarabochia*, 114 Wn.2d

271, 274, 787 P.2d 562 (1990)). Further, we may affirm a grant of summary judgment on any basis supported by the record. *Fabrique v. Choice Hotels Int'l, Inc.*, 144 Wn. App. 675, 682, 183 P.3d 1118 (2008) (citing *Redding v. Virginia Mason Med. Ctr.*, 75 Wn. App. 424, 426, 878 P.2d 483 (1994)).

¶17 "Summary judgment in favor of the defendant is proper if the plaintiff fails to make a prima facie case concerning an essential element of his or her claim." *Seybold v. Neu*, 105 Wn. App. 666, 676, 19 P.3d 1068 (2001). If the defendant meets the burden of showing no material facts remain and the plaintiff lacks sufficient evidence to support an essential element in the case, "the burden shifts to the plaintiff to produce evidence sufficient to support a reasonable inference that the defendant was negligent." *Id.* Medical negligence elements are "duty, breach, causation, and damages." *Colwell*, 104 Wn. App. at 611. Specifically, the plaintiff must prove the "injury resulted from the failure of the health care provider to follow the accepted standard of care [and] [s]uch failure was a proximate cause of the injury complained of." RCW 7.70.040(2).

¶18 "A 'proximate cause' of an injury is defined as a cause which, in a direct sequence, unbroken by any new, independent cause, produces the injury complained of and without which the injury would not have occurred." *Fabrique*, 144 Wn. App. at 683 (citing *Stoneman v. Wick Constr. Co.*, 55 Wn.2d 639, 643, 349 P.2d 215 (1960)). The proximate cause elements are "(1) cause in fact and (2) legal causation." *Id.* (citing *Baughn v. Honda Motor Co.*, 107 Wn.2d 127, 142, 727 P.2d 655 (1986)). "[B]oth elements must be satisfied." *Id.* (citing *Ayers v. Johnson & Johnson Baby Prods. Co.*, 117 Wn.2d 747, 753, 818 P.2d 1337 (1991)). Cause in fact concerns "the 'but for' consequences of an act, or the physical connection between an act and the resulting injury." *Id.* (citing *Hartley v. State*, 103 Wn.2d 768, 778, 698 P.2d 77 (1985)).

¶19 Medical expert testimony is generally required to prove causation. *Id.* Generally, in medical negli-

gence cases, "the plaintiffs must produce competent medical expert testimony establishing that the injury was proximately caused by a failure to comply with the applicable standard of care." *Seybold*, 105 Wn. App. at 676 (citing RCW 7.70.040; *McKee v. Am. Home Prods. Corp.*, 113 Wn.2d 701, 706-07, 782 P.2d 1045 (1989)). Further, "the expert testimony must be based on facts in the case, not speculation or conjecture." *Id.* at 677 (citing *Melville v. State*, 115 Wn.2d 34, 41, 793 P.2d 952 (1990)). "The testimony must be sufficient to establish that the injury-producing situation 'probably' or 'more likely than not' caused the subsequent condition, rather than the accident or injury 'might have,' 'could have,' or 'possibly did' cause the subsequent condition." *Merriman v. Toothaker*, 9 Wn. App. 810, 814, 515 P.2d 509 (1973). The expert testimony must be based on a reasonable degree of medical certainty. *McLaughlin v. Cooke*, 112 Wn.2d 829, 836, 774 P.2d 1171 (1989).

¶20 Because Providence and Dr. Sharma moved for summary judgment on the basis that Ms. Rounds lacked medical expert testimony to establish causation, the burden shifted to Ms. Rounds to produce medical expert testimony on the issue of causation. *See Seybold*, 105 Wn. App. at 675, 677-78 (explaining proximate cause burden shifting); *see also Fabrique*, 144 Wn. App. at 685-86 (same).

¶21 1. Providence. Ms. Rounds contends Providence was negligent in its care of Mr. Rounds, based upon the following actions of Mr. Trombley: (1) inflating the trach tube cuff beyond the minimum occlusive pressure or allowing the cuff to remain overinflated and (2) failing to notify one the attending physicians the cuff was severely overinflated. Ms. Rounds contends these acts and omissions led to the rupture of the cuff, which proximately caused Mr. Rounds' death.

¶22 However, Dr. Simons could not state the cause of the trach tube malfunction:

[Question:] And what happened [the cuff] could have been simply dislodged or could have been ruptured?

[Answer:] We don't know.

[Question:] Either one of those is just as probable, correct?

[Answer:] Correct.

CP at 203. Regarding the problems of the cuff pressure having been set at 60 during the tracheostomy, the appropriateness of waiting 72 hours to adjust the trach tube, and reporting the cuff pressure to Dr. Sharma, Dr. Simon summarized, "[w]e don't know. All of this is speculation because no one was called." CP at 204-05.

¶23 Further, Dr. Cobb stated, "I think it's probably more likely that the tube was displaced than the cuff failed." CP at 91. Dr. Gautam stated the cuff ruptured after the soft tissue around the cartilage in Mr. Rounds' trachea had necrosed, and the exposed cartilage poked the cuff as Mr. Rounds was moved. However, Dr. Gautam acknowledged no evidence showed necrosis in the medical records, and no autopsy was done to determine if necrosis occurred.

¶24 None of Ms. Rounds' three experts stated, more likely than not, the trach tube malfunction was caused by the rupture of the cuff. Dr. Simons could not state the cause of the malfunction; Dr. Cobb stated it was more likely caused by displacement of the tube; and Dr. Gautam's opinion was based upon speculation and conjecture, rather than the facts of the case. *See Seybold*, 105 Wn. App. at 677.

¶25 Ms. Rounds' experts do not establish how the trach tube malfunctioned. Thus, she does not show that but for Mr. Trombley's failure to use reasonable care in maintaining the cuff pressure, Mr. Rounds would not have died. "To establish the cause in fact, the plaintiff must show that he or she would not have been injured but for the health care provider's failure to use reasonable care." *Hill v. Sacred Heart Med. Ctr.*, 143 Wn. App. 438, 448, 177 P.3d 1152 (2008) (citing *McLaughlin*, 112 Wn.2d at 837).

¶26 The sole expert testimony submitted by Ms. Rounds regarding Mr. Trombley's failure to notify an attending physician of cuff overinflation came from Dr. Simons. But, Dr. Simons gave nothing more than "speculation" because

"no one was called." CP at 204-05. Even if a call had been made, no action was likely. In response to questioning, Dr. Simons agreed that with 60 centimeters of water pressure and the cuff in the right location, a 72-hour wait was appropriate: "If you have a pretty good seal and the patient's arterial blood gasses are good, you probably wait." CP at 205. Dr. Simons' testimony does not show "the physical connection between an act and the resulting injury." *Fabrique*, 144 Wn. App. at 683. Dr. Simons did not opine based on case facts that had Mr. Trombley notified an attending physician the cuff was overinflated, Mr. Rounds would not have died. *See Hill*, 143 Wn. App. at 448.

¶27 In sum, Ms. Rounds failed to produce medical expert testimony on the issue of causation against Providence. Because Ms. Rounds failed to make a prima facie case concerning causation, an essential element of her claim, summary judgment was properly granted. *See Seybold*, 105 Wn. App. at 676.

¶28 2. Dr. Sharma. Ms. Rounds contends Dr. Cobb's testimony establishes Dr. Sharma's failure to use stay sutures proximately caused Mr. Rounds' death. However, Dr. Cobb thought, "it's probably more likely that the tube was displaced than the cuff failed." CP at 91. And, while Dr. Cobb cast his opinion as a "logical deduction" rather than "speculation," he could do no more than speculate that Dr. Wylie would understand the purpose of the stay sutures. Further, Dr. Wylie testified that stay sutures would not be self-explanatory to her, undercutting Dr. Cobb's assessment. Additionally, Dr. Wylie testified she was not familiar with the use of stay sutures in tracheostomies, and she is not sure how she would have utilized them. We conclude no fact issue remains on whether the presence of stay sutures would have made any difference in the actions Dr. Wylie took in treating Mr. Rounds.

¶29 In sum, assuming Dr. Sharma failed to comply with the standard of care by failing to use stay sutures in the tracheostomy, Ms. Rounds' failed to produce medical expert testimony showing this failure proximately caused Mr.

Rounds' death. Dr. Cobb failed to opine that it would have made any difference in the outcome if stay sutures had been used. His testimony was speculative. Accordingly, Ms. Rounds failed to produce medical expert testimony on the issue of causation against Dr. Sharma. Because Ms. Rounds failed to produce evidence of causation, an essential element of her claim, summary judgment was properly granted.

¶30 Because Ms. Rounds fails to make out a prima facie case on causation, we do not need to discuss if her "loss of chance" theory applies on the issue of damages.

¶31 Affirmed.

SWEENEY and KORSMO, JJ., concur.

Review denied at 165 Wn.2d 1047 (2009).