**FILED
OCTOBER 24, 2023
In the Office of the Clerk of Court
WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| CHARLES DONEGAN, and ELIZABETH DONEGAN, | ) ) ) | No. 39035-7-III |
| Appellants, | ) ) | |
| v. | ) ) | |
| PUBLIC HOSPITAL DISTRICT NO. 1 OF GRANT COUNTY, d/b/a SAMARITAN HOSPITAL; ROBERT A. GRUVER, AND "JANE DOE" GRUVER, HIS SPOUSE, | ) ) ) ) ) ) | UNPUBLISHED OPINION |
| Respondents, | ) ) | |
| WENATCHEE EMERGENCY PHYSICIANS, P.C.; JENARAH L. TEKIPPE, AND "JOHN DOE" TEKIPPE, HER SPOUSE; SCOTT L. STROMING, AND "JANE DOE" STROMING, HIS SPOUSE; THOMAS B. ETTINGER AND "JANE DOE" ETTINGER, HIS SPOUSE, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

COONEY, J. — After sua sponte striking the plaintiffs' expert witness opinion, the

trial court granted Robert Gruver, PA, and Public Hospital District No. 1 of Grant

County's (collectively "Samaritan Hospital") summary judgment dismissal of Charles

and Elizabeth Donegan's negligence claims. The Donegans appeal, asserting the court erred in striking their expert witness opinions and in concluding the record lacked evidence of causation. We agree with the Donegans, reverse the trial court, and remand for further proceedings.

BACKGROUND

A. FACTS

On Saturday, July 16, 2016, at 6:29 a.m., Charles Donegan arrived for work at Walmart. Shortly before his scheduled 11:00 a.m. lunch break, Mr. Donegan was not feeling well and thought he needed to go home. He clocked out at 10:52 a.m. and then contacted his wife, who was also employed at Walmart, to tell her he was not feeling well and was heading home. As Mr. Donegan walked away from his wife, she noticed he was limping. Shortly after Mr. Donegan arrived home, Ms. Donegan was contacted by her son, who reported Mr. Donegan was slurring his words and was wobbly. Ms. Donegan left Walmart, went home, and transported Mr. Donegan to the emergency room at Samaritan Hospital.

Mr. Donegan arrived at Samaritan Hospital at approximately 12:25 p.m. and was assessed by a triage nurse at 12:36 p.m. The triage nurse reported Mr. Donegan "STATES AROUND 7AM AT WORK STARTED FEELING 'WOBBELY' [sic]." Clerk's Papers (CP) at 273. Mr. Donegan's self-reported history to the triage nurse included numbness in his left hand and, about one-half hour earlier, pressure pain in his

2

left anterior chest.  Ms. Donegan reported he exhibited some slurred speech and had been wobbly when walking earlier in the day.

Mr. Donegan was later assessed by a primary care nurse.  Without disclosing where they obtained his information, the primary nurse also reported Mr. Donegan's symptoms began around 7:00 a.m.  The primary nurse's assessment revealed Mr. Donegan had slurred speech and scored 15 on the Glasgow Coma Scale.[1]  It was also determined that Mr. Donegan was not a candidate for thrombolytic therapy[2] (tPA).  The primary nurse reported normal movement in Mr. Donegan's left arm and leg, that sensation and reflexes were normal, and that Mr. Donegan was verbally responsive and oriented.

Mr. Donegan was also assessed by Robert Gruver, a physician's assistant (PA), at 12:37 p.m.  PA Gruver's comments under the history of present illness on Mr. Donegan provided:

> This is a 75-year-old male who reports that he's had about a 5-1/2 hour history of left arm tingling from his elbow down to his fingertips.  He's had no weakness, no difficulty with speech or swallowing, no shortness of breath, no chest pain, no palpitations, no headache . . . .

CP at 276.  Like the primary nurse, PA Gruver did not report where he obtained the time

---

[1] The record on review is silent on the significance of a score of 15 on the Glasgow Coma Scale.

[2] Thrombolytic therapy involves administering medications to either get rid of blood clots or prevent blood clots from forming.

Mr. Donegan's symptoms began. Although Mr. Donegan had tingling in his left arm,

PA Gruver did not note any weakness or difficulty with speech. An EKG

(electrocardiogram) and CT (computerized tomography) scan of Mr. Donegan's head

were ordered and both came back as normal. Mr. Donegan was discharged at 2:07 p.m.

Two days later, Mr. Donegan returned to Samaritan Hospital with progressive

weakness in his left side and an inability to walk. He also had slurred speech and a facial

droop on the left side. At this point, Mr. Donegan was admitted to Samaritan Hospital

with a diagnosis of an acute cerebrovascular accident, commonly referred to as a stroke.

B. SUPERIOR COURT PROCEEDINGS

The Donegans filed a complaint for medical negligence against Samaritan

Hospital and PA Gruver. They alleged the health care providers breached the duty owed

to Mr. Donegan by failing to timely diagnose and treat his stroke, which caused him to

suffer damages in the form of a loss of a chance of a better outcome. The Donegans

further alleged corporate negligence against Samaritan Hospital.

Samaritan Hospital moved for summary judgment dismissal of the Donegans'

claims. Although Samaritan Hospital did not concede to a breach of the standard of care,

it argued that even if PA Gruver had properly diagnosed Mr. Donegan as suffering a

stroke, tPA either would not or could not have been administered as the treatment must

be administered within three hours of the onset of symptoms. It maintained that, due to

Mr. Donegan's delay in seeking medical intervention, on a more probable than not basis

4

there was nothing Samaritan Hospital could have done to change his outcome.

In support of its motion, Samaritan Hospital provided a declaration from Nerses Sanossian, M.D. Dr. Sanossian opined that Mr. Donegan was not a candidate for tPA because his symptoms began at about 7:00 a.m. With the onset of symptoms occurring at 7:00 a.m., Dr. Sanossian declared that tPA would have had to be administered prior to about 12:30 p.m. Further, Dr. Sanossian noted there was "no evidence of occlusive disease affecting the basilar artery which would have been an indication for thrombectomy." CP at 87.

In opposition to summary judgment, the Donegans relied on their own deposition testimony, along with declarations from James Frey, M.D., and Ann Rodgers, M.D. During Mr. Donegan's deposition, he initially testified he started experiencing symptoms around 10:45 a.m. However, when informed that he clocked out at 10:52 a.m. and being asked if, based off that fact, he believed he started having symptoms before then, Mr. Donegan testified, "To the best of my recollection I started feeling bad about 15 minutes, 15, 20, minutes before I clocked out . . . ." CP at 214.

Dr. Frey was a neurologist who, prior to retirement, founded and directed the stroke program at the Barrow Neurological Institute and had previously worked as a clinical professor of neurology at the University of Arizona School of Medicine. Dr. Frey declared that he maintained an active license to practice medicine and was "available" to give lectures on various subjects in medical science and neurology in

5

particular. CP at 160. Based on his review of Mr. Donegan's medical records, the exhibits, transcripts from the Donegans' depositions, and, "[p]resuming that Mr. Donegan's symptoms began just prior to 11:00 AM," Dr. Frey opined that tPA could and should have been administered within the time frame required to mitigate or resolve Mr. Donegan's stroke symptoms. CP at 161. He testified that, assuming Mr. Donegan's symptoms began just prior to 11:00 a.m. and that he was triaged at 12:36 p.m., it would have been possible for Mr. Donegan to have been diagnosed as having a stroke and treated with tPA by or before 1:36 p.m. Further, Dr. Frey testified that "on a more likely than not basis, that had [tPA] been administered in accordance with the standard of care, Mr. Donegan would have recovered or suffered a much less severe stroke, and therefore not had to endure neurological deficits of the severity that he now lives with." CP at 162.

Dr. Rodgers is a medical doctor licensed to practice in Washington and board certified in emergency medicine. Dr. Rodgers was retained by the Donegans to furnish an opinion on the standard of care applicable to the assessment of a stroke patient. Dr. Rodgers testified that a reasonably prudent health care provider would have, at a minimum, prescribed aspirin, performed a gait test, consulted with the emergency medical doctor on site and brought them into the decision making, performed an NIH[3] stroke scale assessment, and ordered a neurological consult. Dr. Rodgers testified that,

---

[3] National Institutes of Health.

based on her review of the records provided and her education, training, and experience, had Mr. Donegan been evaluated, diagnosed, and treated according to the appropriate standard of care, he more likely than not would have fully recovered or would have recovered with substantially fewer stroke symptoms.

Following oral argument, the trial court denied Samaritan Hospital's motion for summary judgment "without prejudice to its being raised again after further discovery." CP at 371. Thereafter, the parties deposed Dr. Frey and Dr. Rodgers.

During his deposition, Dr. Frey testified it was his understanding that Mr. Donegan's symptoms began around 11:00 a.m. He testified that the effectiveness of tPA was dependent on how quickly it gets administered to the patient and on the severity of the stroke. Dr. Frey conceded that the effectiveness of tPA is not greater than 40 percent regardless of the circumstances. He also testified that if a patient has mild stroke symptoms, tPA may not be administered. Dr. Frey agreed that it would be reasonable to not treat someone with tPA if they presented with only a little numbness and clumsiness in their fingers and face. He explained that there were drawbacks to exposing patients who are not experiencing a "'dangerous problem'" to a "'dangerous drug.'" CP at 405.

Dr. Frey testified that it is reasonable to be conservative when determining the onset of a stroke when considering the use of tPA. He conceded that Mr. Donegan's statement, in response to the time of the onset of his symptoms, of "'I don't know, 10:30, something like that'" was not specific enough to verify when the symptoms actually

7

began. CP at 410. Dr. Frey testified that 20 percent of stroke patients who received a placebo did not experience any long-term symptoms while 31 percent of patients who received tPA "turn out to be almost perfect." CP at 548. In general, Dr. Frey stated that a patient who is treated with tPA within the three-hour mark is 1.7 to 1.9 times more likely to recover better than a patient who receives a placebo. Dr. Frey conceded that by the three-hour mark from the onset of symptoms, the chance of a patient benefiting from tPA is lessened although there may be some benefit up until the four-and-one-half-hour mark.

Dr. Rodgers testified she did not follow up with stroke patients on a long-term basis after they have been discharged from the hospital. Dr. Rodgers admitted she lacked training in neurology but had seen thousands of patients with neurological symptoms and diagnosed hundreds with a stroke. She noted that, had she examined the patient and had the same findings in the neurologic evaluation as PA Gruver, she also likely would have discharged Mr. Donegan. Dr. Rodgers stated that she had not reviewed Mr. Donegan's current medical records and was aware of his current symptoms only as far as they were mentioned in Mr. Donegan's most recent deposition. Dr. Rodgers also admitted that although a decision on whether to administer tPA is a "joint decision" with a neurologist, if there was a decision where she and the neurologist disagreed, she would defer to the neurologist. CP at 577-78.

After concluding the depositions of the Donegans' expert witnesses, Samaritan Hospital again moved for summary judgment dismissal of the Donegans' claims. Although Samaritan Hospital did not concede to a violation of the standard of care, it argued that even if it failed to meet the requisite standard of care, the Donegans had failed to present sufficient evidence to create a genuine dispute of material fact as to proximate cause. Stated otherwise, because Samaritan Hospital reported that Mr. Donegan's symptoms began at around 7:00 a.m., even if he had been properly diagnosed with a stroke, tPA would have had to be administered by approximately 10:00 a.m. Mr. Donegan did not arrive at the hospital until 12:30 p.m. In a lengthy letter decision, the trial court, sua sponte, struck Dr. Frey's opinions and granted Samaritan Hospital's motion, thereby dismissing the Donegans' complaint.

The Donegans appeal.

## ANALYSIS

A. DR. FREY'S OPINIONS

The Donegans contend the trial court erred in striking Dr. Frey's opinion. We agree.

Appellate courts generally review a decision to exclude expert witness testimony at trial under an abuse of discretion standard. *State v. Arndt*, 194 Wn.2d 784, 798, 453 P.3d 696 (2019). However, when reviewing a trial court's evidentiary rulings made in conjunction with a summary judgment motion, the de novo standard of review applies.

*Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998). Likewise, we review

a trial court's *Frye*[4] ruling de novo. *Advanced Health Care, Inc. v. Guscott*, 173 Wn.

App. 857, 871, 295 P.3d 816 (2013).

ER 702 governs the admissibility of expert testimony and provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Under this rule, the testimony must aid the trier of fact, and the witness must qualify as

an expert. *Behr v. Anderson*, 18 Wn. App. 2d 341, 374, 491 P.3d 189 (2021), *review*

*denied*, 198 Wn.2d 1040, 502 P.3d 864 (2022).

Expert testimony must be based on the facts of the case and not speculation.

*Rounds v. Nellcor Puritan Bennett, Inc.*, 147 Wn. App. 155, 163, 194 P.3d 274 (2008)

(quoting *Seybold v. Neu*, 105 Wn. App. 666, 677, 19 P.3d 1068 (2001)). "'The testimony

must be sufficient to establish that the injury-producing situation probably or more likely

than not caused the subsequent condition, rather than the accident or injury might have,

could have, or possibly did cause the subsequent condition.'" *Id.* (internal quotation

marks omitted) (quoting *Merriman v. Toothaker*, 9 Wn. App. 810, 814, 515 P.2d 509

(1973)). Moreover, the testimony must be based on a reasonable degree of medical

certainty. *Id.* "The expert's opinion must be based on fact and cannot simply be a

---

[4] *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

conclusion or based on an assumption if it is to survive summary judgment." *Volk v. DeMeerleer*, 187 Wn.2d 241, 277, 386 P.3d 254 (2016). "[S]peculation and conclusory statements will not preclude summary judgment." *Id.*

"The scope of the expert's knowledge, not [their] professional title, should govern 'the threshold question of admissibility of expert medical testimony in a malpractice case.'" *Hill v. Sacred Heart Med. Ctr.*, 143 Wn. App. 438, 447, 177 P.3d 1152 (2008) (quoting *Pon Kwock Eng v. Klein*, 127 Wn. App. 171, 172, 110 P.3d 844 (2005)). "A physician with a medical degree is qualified to express an opinion on any sort of medical question, including questions in areas in which the physician is not a specialist, so long as the physician has sufficient expertise to demonstrate familiarity with the procedure or medical problem at issue in the medical malpractice action." *Id.*

In its letter decision, the trial court appears to have rejected Dr. Frey's opinions for three reasons. First, the trial court determined that Dr. Frey based his opinions on a differential diagnosis in violation of federal case law. Second, the trial court concluded that Dr. Frey's opinions were grounded in observational studies, which fall short of establishing causation. Third, in an attempt to decide the admissibility of Dr. Frey's opinions, the trial court instead weighed his credibility. We disagree with each of these reasons and address each in turn.

The trial court speculated Dr. Frey's opinions were based on a differential diagnosis or differential etiology. It reasoned that Dr. Frey's failure to consider other

possible explanations for the severity of Mr. Donegan's stroke violated ER 702. In reliance of federal case law, the trial court then concluded that a differential diagnosis is not admissible to prove causation. We disagree with this assessment. Our court does not apply the federal standard for admissibility of expert opinion testimony.[5] Instead, the standard under ER 702 is whether the testimony by a qualified expert will be helpful to the trier of fact. As the trial court recognized, Dr. Frey is a qualified expert. But unlike the trial court, we believe Dr. Frey's opinion would be helpful to the trier of fact. Specifically, Dr. Frey offers opinions related to the effectiveness of tPA treatment if administered within three hours from the onset of symptoms.

Next, the trial court found Dr. Frey's reliance on observational studies merely established a base rate (the frequency of success of tPA treatment) rather than supported causation. Stated otherwise, a base rate is effective for showing a conditional probability, but it falls short of revealing how the failure to treat Mr. Donegan with tPA affected his outcome. The trial court cited *Coogan v. Borg-Warner Morse Tec Inc.* to support the

---

[5] The trial court's letter ruling cites a multitude of federal cases employing the *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) standard for admissibility. Washington relies on the *Frye* standard to decide the admissibility of novel scientific procedures. *State v. Copeland*, 130 Wn.2d 244, 251, 922 P.2d 1304 (1996). Notwithstanding, *Frye* has no applicability here because Dr. Frey's opinion is not based "'upon novel scientific procedures.'" *In re Det. of Berry*, 160 Wn. App. 374, 379, 248 P.3d 592 (2011) (quoting *In re Pers. Restraint of Young*, 122 Wn.2d 1, 56, 857 P.2d 989 (1993)). Thus, the only potential bar to admissibility is ER 702 for which Dr. Frey's opinion qualifies.

exclusion of an expert witness's opinion when the opinion is solely based on actuarial evidence. 197 Wn.2d 790, 801-03, 490 P.3d 200 (2021). Contrary to the facts of *Coogan*, here, Dr. Frey based his opinions on his education, training, and experience, coupled with his review of Mr. Donegan's medical records, the exhibits, and the Donegans' deposition testimony. Dr. Frey's opinions were not grounded purely on observational studies.

Finally, in an attempt to determine the admissibility of Dr. Frey's opinions, the trial court instead weighed his credibility. The trial court took exception to Dr. Frey's failure to take Mr. Donegan's history of smoking habits and age into consideration in forming his opinion. The court stated that Dr. Frey's failure to consider these factors "affect[ed] the reliability and admissibility of any method Dr. Frey employed." CP at 810. These factors speak to the credibility of Dr. Frey's opinion, not its admissibility. As the trial court admitted, "Dr. Frey is qualified to offer an opinion on causation." CP at 814. Dr. Frey's opinion meets the requirements of ER 702 and, on de novo review, will be considered.

B. SUMMARY JUDGMENT

The Donegans contend the trial court erred in granting Samaritan Hospital's summary judgment dismissal of their claims. We agree.

Orders on summary judgment are reviewed de novo. *Keck v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). In deciding a summary judgment motion, the court must

13

consider the evidence and all reasonable inferences from the evidence in the light most favorable to the nonmoving party. *Id*. (citing *Folsom*, 135 Wn.2d at 663). "[W]hen reasonable minds could reach but one conclusion, questions of fact may be determined as a matter of law." *Hartley v. State*, 103 Wn.2d 768, 775, 698 P.2d 77 (1985) (citing *LaPlante v. State*, 85 Wn.2d 154, 531 P.2d 299 (1975)). Summary judgment is appropriate only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Keck*, 184 Wn.2d at 370. An appellate court may affirm summary judgment on any basis supported by the record. *Swinehart v. City of Spokane*, 145 Wn. App. 836, 844, 187 P.3d 345 (2008).

To prevail in a medical negligence claim, a plaintiff must establish:

(1)  The health care provider failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he or she belongs, in the state of Washington, acting in the same or similar circumstances;
(2)  Such failure was a proximate cause of the injury complained of.

Former RCW 7.70.040 (2011). Consequently, "A defendant moving for summary judgment in a medical negligence case bears the initial burden of showing (1) that there is no genuine issue of material fact or, alternatively, (2) that the plaintiff lacks competent evidence to support an essential element of his claim." *Davies v. Holy Family Hosp.*, 144 Wn. App. 483, 492, 183 P.3d 283 (2008), *abrogated on other grounds by Frausto v. Yakima HMA, LLC*, 188 Wn.2d 227, 393 P.3d 776 (2017).

In a corporate negligence claim against a hospital, a plaintiff must show "a duty of care owed to plaintiff by the clinic, a breach of that duty, and proximate cause between the breach and plaintiff's injury." *Douglas v. Freeman*, 117 Wn.2d 242, 248, 814 P.2d 1160 (1991). "'A proximate cause of an injury is defined as a cause which, in a direct sequence, unbroken by any new, independent cause, produces the injury complained of and without which the injury would not have occurred.'" *Rounds*, 147 Wn. App. at 162 (internal quotation marks omitted) (quoting *Fabrique v. Choice Hotels Int'l, Inc.*, 144 Wn. App. 675, 683, 183 P.3d 1118 (2008)). Proximate cause requires showing of both cause in fact and legal causation. *Id.*

"Cause in fact concerns 'the but for consequences of an act, or the physical connection between an act and the resulting injury.'" *Id.* (quoting *Fabrique*, 144 Wn. App. at 683). In medical negligence cases, to show cause in fact, plaintiffs generally must show that they would not have been injured but for the health care provider's failure to adhere to the standard of care. *Mohr v. Grantham*, 172 Wn.2d 172 Wn.2d 844, 850, 262 P.3d 490 (2011). This generally must be established through expert testimony. *Rounds*, 147 Wn. App. at 162-63.

Before the trial court, Samaritan Hospital's motion focused on causation, not on its alleged violations of the standard of care. However, questions related to how and when Samaritan Hospital may have violated the standard of care appertain to the question of causation. Samaritan Hospital relies on its records to show Mr. Donegan reported his

15

stroke symptoms began at 7:00 a.m., a fact Mr. Donegan never overtly contested. If Mr. Donegan's symptoms began at 7:00 a.m., the medical experts agree he would not have been a candidate for tPA when he reported to the emergency room at 12:36 p.m. Hence, Samaritan Hospital argues, there is nothing in the record to establish that, but for its alleged violation of the standard of care, Mr. Donegan's outcome would have been any different. Mr. Donegan posits that if his symptoms began 15 to 20 minutes prior to when he clocked out of work at 10:52 a.m., as he has testified, the three-hour window to administer tPA would not have expired until approximately 1:37 p.m.

As it relates to the standard of care, the Donegans advance the testimony of Dr. Frey. According to Dr. Frey, stroke patients are often times unaware of their symptoms. Because of this, he accepts reports from those who observed the patient as a "qualified observer." CP at 410. Frequently, "qualified observers" are in a better position than the patient to detect the onset of apparent symptoms of a stroke. Ms. Donegan, as a likely "qualified observer," attempted to provide information to Samaritan Hospital. According to Ms. Donegan, when she endeavored to advocate for Mr. Donegan's care, she felt "dismissed" and "unvalidated." CP at 236. Ms. Donegan testified she first noticed physical signs of Mr. Donegan having a stroke, "When he came up at lunch [at 11:00 a.m.]." CP at 248. Her observations were unwelcomed by Samaritan Hospital.

In considering the evidence, as well as all reasonable inferences from the evidence, in the light most favorable to the Donegans, reasonable minds could reach

16

differing conclusions as to when Mr. Donegan's symptoms began, how the observations of Ms. Donegan, if accepted by Samaritan Hospital, may have influenced the evaluation and treatment of Mr. Donegan, and whether PA Gruver's failure to adhere to the requisite standard of care in assessing a stroke patient prevented Samaritan Hospital from gathering information relevant to diagnosing Mr. Donegan.

C. LOSS OF CHANCE FOR A BETTER OUTCOME

Samaritan Hospital argues that Mr. Donegan produced insufficient evidence in support of his lost chance claim to survive summary judgment. Washington courts recognize lost chance as a compensable injury. *Mohr*, 172 Wn.2d at 857. Even when the loss of chance for a better outcome falls below 50 percent, it may still be a compensable injury. For example, in *Shellenbarger v. Brigman*, 101 Wn. App. 339, 3 P.3d 211 (2000), a doctor failed to diagnose and treat the plaintiff's pulmonary fibrosis. Division Two of this court determined that a 20 percent loss of a chance of slowing the plaintiff's pulmonary fibrosis was a compensable injury. *Id*. at 348. In a suit where the alleged injury is a lost chance, the plaintiff bears the burden of producing "expert testimony that includes an opinion as to the percentage or range of percentage reduction of the better outcome." *Christian v. Tohmeh*, 191 Wn. App. 709, 731, 366 P.3d 16 (2015).

Here, Dr. Frey presented varying opinions regarding Mr. Donegan's chance for a better outcome had tPA been administered within three hours of the onset of his symptoms. Dr. Frey testified that stroke patients who do not receive tPA generally have

about a 20 percent chance of a full recovery and had tPA been administered within the three-hour time frame, Mr. Donegan would have been 1.7 to 1.9 times more likely to have better results in his recovery.[6] Without quantifying Mr. Donegan's chance for a better outcome, Dr. Frey testified, "had [tPA] been administered in accordance with the standard of care, Mr. Donegan would have recovered or suffered a much less severe stroke . . . ." CP at 162. Dr. Frey further opined that had tPA been administered, Mr. Donegan "would not have been deprived of a greater than 50% chance of resolving or substantially mitigating the permanent disabling neurological deficits . . . ." CP at 162. Similarly, Dr. Sanossian testified that generally one who receives tPA within three hours of onset of stroke symptoms has a measurable reduction of disability of approximately 32 percent.

Samaritan Hospital suggests that Dr. Frey's testimony regarding the potential benefit of administering tPA within the three-hour time period is insufficient because it was not distinct to Mr. Donegan, meaning it lacks consideration of his specific chance of recovery based on his age and various other factors. In viewing the facts in a light most favorable to the Donegans, Dr. Frey's testimony suffices. Again, Dr. Frey based his

---

[6] 1.7 to 1.9 times more likely to have better results in his recovery than the 20 percent of patients who fully recover without being treated with tPA places Mr. Donegan's loss of a chance of a better outcome between 34 to 38 percent.

opinions on his education, training, and experience in conjunction with his review of

Mr. Donegan's medical records, the exhibits, and the Donegans' deposition testimony.

CONCLUSION

The Donegans presented sufficient evidence to support their claimed damages for

loss of chance of a better outcome and defeat summary judgment. We reverse the

dismissal of their claims and remand for further proceedings.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Cooney, J.

WE CONCUR:


_____
Lawrence-Berrey, A.C.J.



_____
Pennell, J.

19