**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

/FILE\
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE_____

Fairhurst. G
~for~ CHIEF JUSTICE

This opinion was filed for record.

at __8:00 am__ on __Dec 22, 2016__

E. ___, Deputy

for SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| BEVERLY R. VOLK, as guardian for Jack Alan Schiering, a minor; and as personal representative of the Estates of Philip Lee Schiering and Rebecca Leigh Schiering; and on behalf of the statutory beneficiaries of Philip Lee Schiering; and BRIAN WINKLER, individually,<br><br>    Respondents/Cross-Petitioners,<br><br>v.<br><br>JAMES B. DEMEERLEER, as personal representative of the Estate of Jan DeMeerleer; HOWARD ASHBY, M.D., and JANE DOE ASHBY, husband and wife, and the marital community composed thereof; SPOKANE PSYCHIATRIC CLINIC, P.S., a Washington business entity and health care provider; and DOES 1 through 5,<br><br>    Petitioners/Cross-Respondents. | No. 91387-1<br><br><br><br>EN BANC<br><br><br><br>Filed _____ |

FAIRHURST, J.—Jan DeMeerleer murdered Rebecca Schiering and her nine

year old son Philip and attempted to murder Schiering's older son, Brian Winkler.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Volk v. DeMeerleer*, No. 91387-1

After the attack, DeMeerleer committed suicide. DeMeerleer had been an outpatient of psychiatrist Dr. Howard Ashby for nine years leading up to the attack, during which time he expressed suicidal and homicidal ideations but never named Schiering or her children as potential victims. We must decide whether Ashby, a mental health professional, owed DeMeerleer's victims a duty of care based on his relationship with DeMeerleer. We hold that Ashby and DeMeerleer shared a special relationship and that special relationship required Ashby to act with reasonable care, consistent with the standards of the mental health profession, to protect the foreseeable victims of DeMeerleer. Ashby concedes the existence of a special relationship between him and DeMeerleer. The foreseeability of DeMeerleer's victims is a question of fact appropriately resolved by the fact finder. Accordingly, we affirm the Court of Appeals in part and reverse the trial court's summary judgment dismissal of the medical negligence claim.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

A.    Factual background

Ashby began treating DeMeerleer at the Spokane Psychiatric Clinic PS (Clinic) in September 2001. DeMeerleer had previously been diagnosed with bipolar disorder and associated disorders.

Ashby's notes from the initial meeting show that in 1992 DeMeerleer was hospitalized for two weeks because of suicidal ideation. Following his

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

hospitalization, DeMeerleer began a medication regimen that included Depakote, a medication meant to treat manic episodes of his bipolar disorder, but DeMeerleer ceased taking the medication soon after. In 1996, DeMeerleer married his wife, Amy. In 1997, DeMeerleer again began having suicidal ideations, at which time he sought outpatient treatment. DeMeerleer was again prescribed Depakote but stopped taking it because he disliked the side effects. Around that time, DeMeerleer evidenced grandiose behavior resulting in job loss and also experienced self-professed suicidal and homicidal ideations. DeMeerleer stated that he had played Russian roulette and at one point he lay on train tracks hoping to be decapitated.

Ashby noted DeMeerleer's history of "poor compliance" with his medication regimens as well as the observation that DeMeerleer's stressors included job loss. Clerk's Papers (CP) at 239. Ashby started DeMeerleer on another regimen of Depakote to treat his bipolar disorder and noted that monitoring compliance would be necessary. DeMeerleer provided a written submission to Ashby where he personally described his condition as follows:

> • Despises lesser creatures; no remorse for my actions/thoughts on other living creatures.
> •Delusional and psychotic beliefs argued to the point of verbal abusive [sic] and fighting.
> •No need for socialization; in fact, prefers to psychotically depopulate the world (i.e. "do Your Part" [CYP] terrorist philosophies).
> •Wants to destroy; pounds on computer keyboard, slams phone receiver, swings fists.
> •Has no use for others; everyone else in world is useless.

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

•Reckless driving; no fear of danger in any circumstance, even "near misses."
•Acts out fantasies of sex with anyone available.

CP at 85 (second alteration in original). Amy DeMeerleer also provided written information regarding DeMeerleer's condition where she stated:

•Makes mistakes on projects (i.e. breaking something) and quickly moves into dangerous rage; actually easily slips into depression after this type of trigger.
•Severe lack of sleep coupled with dreams of going on killing or shooting sprees.
•Drives automobiles very fast (at least 20 to 30 MPH above speed limit) without seat belt while showing no fear at all when in dangerous situations; applies even with child in car.
•Expresses severe "road rage" at other slower drivers, even as a passenger (he's NOT driving).
•Has an "All or Nothing" attitude; will actually verbally express "Live or Die!"

CP at 85-86.

In 2003, DeMeerleer learned his wife was having an affair. DeMeerleer's wife divorced him shortly after. During this time, DeMeerleer suffered severe depression and expressed suicidal and homicidal thoughts. DeMeerleer assured Ashby he would not act on the thoughts, and Ashby took no additional steps outside of continuing medication and support. DeMeerleer admitted to confronting his ex-wife's new boyfriend. DeMeerleer also admitted to having grudge or revenge thoughts and fantasies following his divorce, but Ashby's notes did not state an identifiable target of the thoughts.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

In 2005, DeMeerleer informed Ashby that he had begun a serious relationship with Schiering. Schiering was the mother of twin sons Philip and Jack Schiering and Brian Winkler. This same year, DeMeerleer began evidencing volatile behavior, particularly after an incident in which his truck was vandalized. DeMeerleer took two loaded firearms and ammunition to the location of the vandalism and waited for the thieves to return so he could exact some form of retribution. This prompted DeMeerleer's family to intervene and remove the firearms from DeMeerleer's home. DeMeerleer's mother also informed Ashby that DeMeerleer's thoughts had progressed from suicidal to homicidal.

DeMeerleer's relationship with Schiering and her children progressed rapidly, and within the first year he had fallen deeply in love with Schiering and her children often called DeMeerleer "dad." CP at 196. In 2009, Schiering became pregnant with DeMeerleer's child. DeMeerleer and Schiering were initially excited about the prospect of having the child; however, after DeMeerleer struck Jack, Schiering's nine year old autistic son, Schiering moved herself and her children out of DeMeerleer's home and terminated the pregnancy. Around this time, DeMeerleer was also laid off from his job.

DeMeerleer contacted the Clinic in serious distress, at which time the Clinic referred DeMeerleer to community-based mental health clinics and encouraged him to call back if the referrals proved unsuccessful. Roughly one month after

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

DeMeerleer contacted the Clinic, Schiering read e-mails between DeMeerleer and his mother that discussed Schiering and her children in a negative light. This worsened the divide between DeMeerleer and Schiering.

In April 2010, DeMeerleer met with Ashby for what would be the final time. Despite what was occurring in his life, DeMeerleer told Ashby he was stable. At this meeting, however, DeMeerleer also stated he was having suicidal ideation but would not act on it. Ashby noted that DeMeerleer's mood was unstable but chose to continue DeMeerleer's medication regimen and took no additional action. Ashby's clinical notes from that meeting stated:

> Jan indicates that his life is stable, he is reconstituting gradually with his fiancé[e]. They are taking marriage classes, he can still cycle many weeks at a time. Right now he is in an expansive, hypomanic mood, but sleep is preserved. He has a bit more energy and on mental status, this shows through as he is a bit loquacious but logical, goal oriented and insight and judgment are intact. He states when depressed he can get intrusive suicidal ideation, not that he would act on it but it bothers him. At this point it's not a real clinical problem but we will keep an eye on it.
>
> Plan: We will continue Risperdal, Depakote and [bupropion].

CP at 234.

Although DeMeerleer and Schiering briefly mended their relationship, at which time DeMeerleer's mental condition improved, on July 16, 2010 Schiering ended their relationship for good. DeMeerleer did not attempt to contact Ashby or the Clinic.

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

During the night of July 17, 2010, or the early morning of July 18, 2010, DeMeerleer entered Schiering's home. DeMeerleer shot and killed Schiering and her son Philip. DeMeerleer also attempted to slash the throat of Winkler, but Winkler was able to escape and summon help. Following the attack, DeMeerleer returned to his home where he took his life.

B.     Procedural history

Schiering's mother, Beverly Volk, and Schiering's older son, Winkler (hereinafter referred to as Volk), filed medical malpractice and medical negligence claims against Ashby and the Clinic, alleging they failed to follow the accepted standard of care for a psychiatrist and psychiatric clinic "providing mental health/psychiatric services in Washington."[1] CP at 31.

Ashby denied violating any standard of care, and he and the Clinic moved for summary judgment on the basis that the attack was not foreseeable and that Ashby did not owe DeMeerleer's victims a duty of care. Despite Ashby's concession that a special relationship sufficient to satisfy *Petersen*[2] existed between him and

---

[1]Volk also sued DeMeerleer's estate. The superior court consolidated Volk's suits against DeMeerleer's estate, Ashby, and the Clinic.

[2]*Petersen v. State*, 100 Wn.2d 421, 671 P.2d 230 (1983). Relying on *Restatement (Second) of Torts* § 315(a) (Am. Law Inst. 1965), we stated in *Petersen* that there is a duty to act for the potential victim of a psychiatric patient when "a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct." *Id.* at 426 (quoting RESTATEMENT § 315(a)). In that context, the actor would be the mental health professional and the third person would be the mental health patient. Stated another way, pursuant to *Restatement* § 315 and *Petersen*, once a special relation exists between the mental health

7

DeMeerleer, Ashby and the Clinic argued that Volk was unable to establish the foreseeability of the attack without "an actual threat of violence against Jack Schiering, Philip Schiering, Rebecca Schiering or Brian Winkler." CP at 48. Ashby and the Clinic claimed that the only available actions were to have DeMeerleer civilly committed or to warn Schiering or authorities of the potential danger. Ashby and the Clinic claimed immunity for their failure to have DeMeerleer committed under RCW 71.05.120, and argued they had no duty to warn Schiering because DeMeerleer never communicated an "'actual threat of physical violence against a reasonably identifiable victim or victims.'" CP at 54 (emphasis omitted) (quoting RCW 71.05.120(2)).

To support their motion for summary judgment, Ashby and the Clinic proffered affidavits from several of DeMeerleer's friends and family. The affidavits explained that no one with whom DeMeerleer had interacted in the days leading up to the murders suspected he was having psychological issues, nor did they believe he was capable of the acts he perpetrated against Schiering and her sons.

In response to Ashby and the Clinic's motion for summary judgment, Volk maintained that *Petersen* provided the duty that psychiatrists owe third parties once the psychiatrist and patient form a special relationship. The *Petersen* duty, Volk

---

professional and his patient, the mental health professional owes a duty of reasonable care to any foreseeable victim of the patient.

contended, requires psychiatrists to take reasonable precautions to protect anyone who might foreseeably be endangered by the dangerous propensities of the psychiatrist's patient. Volk argued that Ashby and the Clinic breached a duty owed to Schiering and her sons by failing to perform risk assessments and intensive psychiatric treatment on DeMeerleer. Volk also posited that the medical malpractice claim embodied a "loss of chance the [attack] wouldn't have occurred based on loss of chance DeMeerleer would have had a better psychiatric outcome had he been treated properly by [Spokane Psychiatric Clinic]." CP at 77.

To oppose summary judgment, Volk submitted an affidavit from forensic psychiatrist James Knoll, MD. Knoll opined that Ashby breached the requisite standard of care for psychiatrists in Washington by failing to inquire into DeMeerleer's suicidal thoughts and instead relying on DeMeerleer's self-reporting. Knoll further expressed that inquiry into DeMeerleer's mental state, including an adequate suicide assessment, may have revealed the threat so that further action could have been taken to prevent harm to Schiering and her sons. Knoll also explained that when patients are suicidal, they often reveal homicidal thoughts upon further inquiry. According to Knoll, Ashby should have scheduled follow up appointments with DeMeerleer in the months leading up to the murders and, if Ashby had properly monitored DeMeerleer, his condition may not have digressed to the point that it did. Finally, Knoll stated that Ashby's negligent treatment was a

9

"causal and substantial factor" in bringing about the harm and the loss of chance of a better outcome. CP at 91.

The trial court granted Ashby and the Clinic's motion for summary judgment. The trial court issued findings that stated Volk failed to establish a genuine issue of material fact that DeMeerleer made actual threats of harm directed at Schiering or her sons prior to the attack and that Ashby was under no legal duty to warn Schiering or her sons prior to the incident.

Volk appealed, arguing both that *Petersen* was applicable and that *Petersen*'s holding did not require actual threats to identifiable persons before a duty was imposed on the psychiatrist. Ashby and the Clinic asserted that *Petersen*'s duty conflicted with statutes limiting disclosure of patient information, and no duty to warn or protect third parties can be imposed on psychiatrists absent an actual threat to an identifiable victim. In a split decision, Division Three reversed the summary judgment in part. *Volk v. DeMeerleer*, 184 Wn. App. 389, 337 P.3d 372 (2014). The Court of Appeals reinstated Volk's medical negligence claim, holding *Petersen* was applicable and Knoll's affidavit created genuine issues of material fact regarding whether Ashby and the Clinic breached the duty of care imposed by *Petersen*. *Id.* at 434-35. However, the Court of Appeals affirmed summary judgment as to the loss of chance portion of the medical malpractice claim. *Id.* at 429-30. The Court of Appeals reasoned that loss of chance requires expert testimony stating actual

10

percentage of lost chance, which Knoll failed to provide. *Id.* The Court of Appeals also affirmed summary judgment to the extent that Volk's claims rested on Ashby and the Clinic's breach on a failure to have DeMeerleer involuntarily committed. *Id.* at 434.

Ashby and the Clinic both petitioned for review of the Court of Appeals' holding that reinstated the medical negligence claim based on the *Petersen* duty. Volk answered both petitions and cross petitioned, seeking review of the Court of Appeals' decision to affirm dismissal of the loss of chance claim. Ashby and the Clinic both answered Volk's petition. We granted review on all issues. *Volk v. DeMeerleer*, 183 Wn.2d 1007, 352 P.3d 188 (2015).

## II. ISSUE

A.     Does the *Restatement (Second) of Torts* § 315 (Am. Law Inst. 1965) (*Restatement*) duty apply in the context of outpatient psychiatric treatment?

B.     Did the Court of Appeals err by applying two differing levels of speculation to determine the admissibility of expert testimony?

C.     Does Washington's loss of chance doctrine extend to nonpatient third parties?

## III.   ANALYSIS

A.     When a *Restatement* § 315 special relation exists, mental health professionals owe their outpatients' foreseeable victims a duty of reasonable care

Because the trial court granted summary judgment in favor of Ashby and the Clinic, our overarching analysis concerns whether that grant was proper. When

11

*Volk v. DeMeerleer*, No. 91387-1

reviewing grants of summary judgment our review is de novo and we perform the same inquiry as the trial court. *Aba Sheikh v. Choe*, 156 Wn.2d 441, 447, 128 P.3d 574 (2006) (quoting *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300, 45 P.3d 1068 (2002)). Summary judgment is appropriate when there is "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." CR 56(c). When engaging in this inquiry, we construe all facts and all reasonable inferences "in the light most favorable to the nonmoving party." *Scrivener v. Clark Coll.*, 181 Wn.2d 439, 444, 334 P.3d 541 (2014) (citing *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 226, 770 P.2d 182 (1989)).

1.  Restatement *§ 315 special relation duty*

We begin by noting that Volk's claim stemming from our *Petersen* decision is appropriately characterized as a medical negligence claim. As Volk has reiterated repeatedly, perhaps unartfully given the confusion surrounding the issue, the claim based on the *Petersen* duty is one of medical negligence, not medical malpractice. Though the difference may seem subtle, medical malpractice imposes a duty on the medical professional to act consistently with the standards of the medical profession, and the duty is owed to the medical professional's *patient. See Paetsch v. Spokane Dermatology Clinic, PS*, 182 Wn.2d 842, 850, 348 P.3d 389 (2015). At common law, Washington does not recognize a cause of action for medical malpractice absent a physician/patient relationship. *See Riste v. Gen. Elec. Co.*, 47 Wn.2d 680, 682, 289

12

*Volk v. DeMeerleer*, No. 91387-1

P.2d 338 (1955). Pursuant to RCW 4.04.010, this common law approach is the law of Washington, and we have previously declined to adopt the view that medical malpractice suits are available to nonpatient third parties against physicians. *See Paetsch*, 182 Wn.2d at 850 n.6. Volk fails to address this common law requirement. We therefore affirm the trial court's grant of summary judgment and reverse the Court of Appeals to the extent that it held that summary judgment was improper regarding the medical malpractice claims because neither Schiering nor her children were Ashby's patients.

*Restatement* § 315 imposes an alternate duty to that imposed by medical malpractice. The § 315 duty, as articulated by this court in *Petersen*, is owed by the medical professional to a victim based on a special relationship between the mental health professional and the professional's patient. *See Petersen*, 100 Wn.2d at 428. The foreseeability of the victim, as well as what actions are required to fulfill this duty, is informed by the standards of the mental health profession. *Id.*

In Washington, "[t]he elements of negligence include the existence of a duty to the plaintiff, breach of that duty, and injury to the plaintiff proximately caused by the breach." *Aba Sheikh*, 156 Wn.2d at 447-48 (citing *Degel v. Majestic Mobile Manor, Inc.*, 129 Wn.2d 43, 48, 914 P.2d 728 (1996)). Generally, a person has no duty to prevent a third party from causing harm to another. *Hertog v. City of Seattle*,

13

*Volk v. DeMeerleer*, No. 91387-1

138 Wn.2d 265, 276, 979 P.2d 400 (1999) (citing *Taggart v. State*, 118 Wn.2d 195, 218, 822 P.2d 243 (1992)).

Section 315 of the *Restatement* is an exception to the general common law rule of nonliability for the criminal or tortious acts of third parties and defines a "special relation." *Petersen*, 100 Wn.2d at 426 (citing *Lipari v. Sears, Roebuck & Co.*, 497 F. Supp. 185, 188 (D. Neb. 1980); *Tarasoff v. Regents of Univ. of Cal.*, 17 Cal. 3d 425, 435, 551 P.2d 334, 131 Cal. Rptr. 14 (1976)). *Restatement* § 315[3] states:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
> 　　(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
> 　　(b) a special relation exists between the actor and the other which gives to the other a right to protection.

Absent a special relationship, "the actor is not subject to liability if he fails, either intentionally or through inadvertence, to exercise his ability so to control the actions of third persons as to protect another from even the most serious harm." RESTATEMENT § 315 cmt. b.

This court has held that a special relationship exists under § 315, triggering the imposition of a duty to protect against foreseeable dangers, on a showing that a definite, established, and continuing relationship exists between the defendant and

---

[3]Because no special relation existed between Ashby and Schiering and her children, this case must be considered under the *Restatement* § 315(a) and not (b).

14

the third party. *See Honcoop v. State*, 111 Wn.2d 182, 193, 759 P.2d 1188 (1988) (citing *Petersen*, 100 Wn.2d at 426-28; *Tarasoff*, 17 Cal. 3d 435).[4]

This case requires us to consider what duty, if any, a private mental health professional (actor) owes to the putative foreseeable victim (other) of the professional's outpatient (third person). *Petersen* is the most relevant analog to the present case. There, we held that once a mental health professional and a patient establish a relationship pursuant to *Restatement* § 315, the professional "incur[s] a duty to take reasonable precautions to protect *anyone* who might foreseeably be endangered by" the patient's condition.[5] *Petersen*, 100 Wn.2d at 428 (emphasis added).

Although we had previously recognized a cause of action in a medical negligence case when a doctor's patient injured a victim,[6] *Petersen* provided us the

---

[4]The dissent mischaracterizes our holding in *Honcoop*. Dissent at 6. In *Honcoop*, we simply held that regulatory control does not obviate the need for a "definite, established and continuing relationship between the defendant and the third party" to establish a special relationship described in *Restatement* § 315. 111 Wn.2d at 193. We did not hold, as the dissent asserts, that control is determinative. *Id.*

[5]Nothing in *Petersen* required the psychiatrist in that case to actually control the patient's actions. Instead, the psychiatrist was under a duty to "take reasonable precautions" in order to mitigate or prevent the dangerous propensities of his patient, precautions that were informed by the professional mental health standards. *Petersen*, 100 Wn.2d at 428.

[6]In reaching our decision in *Petersen*, we began by noting that a victim may pursue a cause of action against a doctor when the doctor fails to warn his patient of a prescribed drug's side effects. *See Kaiser v. Suburban Transp. Sys.*, 65 Wn.2d 461, 398 P.2d 14, 401 P.2d 350 (1965). The patient in *Kaiser* was a bus driver, and as a result of the doctor's failure to warn the patient of the prescribed drug's side effects, the patient fell asleep while operating a bus, wrecked the bus, and injured the plaintiff, who was a passenger on the bus at the time of the accident. *Id.* at 462-63. There, the court explained that the doctor should have reasonably foreseen the harm that would result from the failure to warn the patient of the drug's side effects. *Id.* at 464.

15

opportunity to address whether a mental health professional and a patient have the requisite relationship to satisfy § 315 of the *Restatement*. To inform our decision, we relied primarily on *Tarasoff*, the seminal case expressing the duty owed by mental health professionals to the victims of their patients.[7] *Id.* at 427. In *Tarasoff*, the California Supreme Court, citing the *Restatement* § 315 duty, held the mental health professional/outpatient relationship was sufficient to impose an affirmative duty on the therapist to protect the foreseeable victims of their patients. *Id.* (citing *Tarasoff*, 17 Cal. 3d at 435). The *Tarasoff* court "ruled that when a psychotherapist determines, or, pursuant to the standards of the profession, should determine, that a patient presents a serious danger of violence to another the therapist incurs an obligation to use reasonable care to protect the intended victim against such danger." *Id.* (citing *Tarasoff*, 17 Cal. 3d at 435). As interpreted by the *Petersen* court, "discharge of the duty may require the therapist to take whatever steps are necessary under the circumstances, including possibly warning the intended victim or notifying law enforcement officials." *Id.*[8]

---

[7]Despite characterizations to the contrary, the therapists in *Tarasoff* did not know the identity of the victim prior to the attack. Rather, as we explained in *Petersen*, "the patient informed his therapist that he intended to kill a young woman. Although the patient did not specifically name [the victim] as his intended victim, plaintiffs alleged, and the trial court agreed, that the defendant therapists could have readily identified the endangered person as [the victim]." 100 Wn.2d at 427.

[8]In our evaluation of *Tarasoff*, we acknowledged that subsequent California decisions limited *Tarasoff*'s holding by requiring that victims be "readily identifiable" before liability is imposed on the treating psychiatrists. *Petersen*, 100 Wn.2d at 427-28 (citing *Thompson v. County of Alameda*, 27 Cal. 3d 741, 752-54, 614 P.2d 728, 167 Cal. Rptr. 70 (1980); *Mavroudis v. Superior Court*, 102 Cal. App. 3d 594, 600-01, 162 Cal. Rptr. 724 (1980)). We also considered a second

16

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

In finding that the mental health professional/outpatient relationship met the requirements of §315, the California Supreme Court relied *solely* on an expansive reading of §§ 315 et seq., under which affirmative duties to act are imposed whenever the nature of the relationship warrants social recognition as a special relation, not based on any hypothetical ability to control the patient. *See id.*; *see also Estates of Morgan v. Fairfield Family Counseling Ctr.*, 77 Ohio St. 3d 284, 294, 673 N.E.2d 1311 (1997). The *Tarasoff* court explained, "[C]ourts have increased the number of instances in which affirmative duties are imposed not by direct rejection of the common law rule [of nonliability for nonfeasance], but by expanding the list of special relationships which will justify departure from that rule." 17 Cal. 3d at 435 n.5.

Considering the facts before us in *Petersen*, we held that the doctor in that case had a duty to take reasonable precautions to protect *anyone* who might foreseeably be endangered by his patient's "drug-related mental problems." 100 Wn.2d at 428. We reasoned that the doctor knew his patient was potentially dangerous, was possibly unpredictable, and evidenced poor compliance with his

---

line of cases that were contrary to California's limiting approach where other courts opted to retain the original more expansive *Tarasoff* standard. *Id.* at 428. The second line of cases imposed a duty on therapists when they should "reasonably foresee that the risk engendered by the patient's condition would endanger others," without the "readily identifiable" requirement. *Id.* (citing *Semler v. Psychiatric Inst.*, 538 F.2d 121, 124 (4th Cir. 1976); *Lipari*, 497 F. Supp. at 194; *Williams v. United States*, 450 F. Supp. 1040, 1046 (D.S.D. 1978)). Although California had chosen to limit *Tarasoff*'s holding, we expressly elected to retain the more expansive duty embraced by the second line of cases. *Id.* at 428-29.

17

*Volk v. DeMeerleer*, No. 91387-1

medication regimen during their prior interactions. *Id.* Because the doctor failed to take any other actions, including but not limited to seeking additional confinement, a question of material fact existed as to whether the doctor was negligent. *Id.* at 435-36.

Ashby and the Clinic ask us to interpret *Petersen* as a § 319 take charge case, and disavow the duty between a mental health professional and his outpatient's victims based on the supposed lack of control a mental health professional exerts over his outpatient. The amount of control Ashby and the Clinic would require is erroneously derived from our interpretations of the related, but distinct, take charge relationship of § 319, rather than the special relationship of § 315, on which we relied in *Petersen*.[9] *Restatement* § 319 defines the "take[] charge" relationship as: "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm."

One need only examine our prior decisions considering the § 319 take charge relationship to see that *Petersen* was not a take charge case. As we have interpreted § 319, a take charge duty to act for the benefit of reasonably foreseeable victims

---

[9]The *Washington Practice* series also recognizes the distinction between the "take charge" relationship and the special relationship envisioned by this court in *Petersen*. *See* 16 DAVID K. DEWOLF & KELLER W. ALLEN, WASHINGTON PRACTICE: TORT LAW AND PRACTICE § 2:12 (4th ed. 2013).

18

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

exists in certain relationships, including the parole officer/parolee relationship, the probation officer/probationer relationship, and the corrections officer/community custody offender relationship. *See Taggart*, 118 Wn.2d 195; *Hertog*, 138 Wn.2d 265; *Joyce v. Dep't of Corr.*, 155 Wn.2d 306, 119 P.3d 825 (2005).

In *Taggart*, examining the parole officer/parolee relationship, "take charge" was characterized by parole officers' ability to monitor parolees' compliance with release conditions, regulate parolees' movements, impose special conditions on parolees, such as refraining from alcohol or drug use or not possessing firearms, and the parole officers' knowledge of the parolees' criminal histories and ability to monitor parolees' progress. 118 Wn.2d at 219-20. When a parolee's criminal history and progress indicate that he or she is likely to cause bodily harm to others if not controlled, the parole officer must exercise reasonable care to control the parolee. *Id.* at 220. There, we held that the duty imposed by § 319 is "similar," but we did not state that it was the same duty expressed in *Petersen*. *Id.* at 219.

In *Hertog*, considering the relationship between municipal probation counselors and probationers, we found a take charge relationship existed due to many of the same features found in the parole officer/parolee relationship, but emphasized the ability of counselors to monitor probationers' compliance as well as their duty to report violations to the court. 138 Wn.2d at 279.

19

Finally, in *Joyce*, we evaluated the corrections officer/offender relationship when the offender remains under community supervision. 155 Wn.2d at 309. We found that state corrections officers "take charge" of offenders on community custody based again on many of the same features expressed in *Taggart*. *Id.* at 316-17. However, we specifically recognized that in all take charge relationships, including the corrections officer/offender relationship, the government assumed a duty of supervision over the third party to ensure compliance with certain conditions and was therefore required to exercise reasonable care in monitoring compliance and dangerousness. *Id.* at 316; *see also Bishop v. Miche*, 137 Wn.2d 518, 973 P.2d 465 (1999) (recognizing take charge duty of county probation officers).

*Taggart*, *Hertog*, and *Joyce* all relied on *Petersen* as expressing a general duty under § 315 because *Petersen* was the first case to recognize the existence of a special relationship pursuant to the *Restatement*. Still, our express adoption of § 319 in all of those cases when we had refrained from doing so in *Petersen* presupposes that the relationships at issue in those cases were distinct from the § 315 special relationship duty. This distinction was presumably due to the assumption of a duty of supervision and a greater degree of control available to the supervising party in the § 319 take charge cases.[10]

---

[10]In *Taggart*, we explicitly rejected the amount of control that Ashby and the Clinic ask us to impose and unambiguously stated that even pursuant to a § 319 take charge relationship, the relationship need not be custodial in nature or even continuous in order for a duty to exist. 118

Distinctly, under *Petersen*, once a special relationship is formed (one that is definite, established, and continuing), a duty exists without regard for the "control" principle guiding the § 319 take charge cases. The relationship in *Petersen* originated from an involuntary commitment, but there was nothing in that case that indicated the doctor was to have a continued relationship with his patient, or that he was to monitor his patient's condition like the relationships described in *Taggart*, *Hertog*, and *Joyce*. Still, the nature of the relationship in *Petersen* gave the doctor unique insight into the potential dangerousness of his patient as well as the identity of potential victims. While other individuals may have been aware of his patient's actions, the doctor's relationship to his patient, combined with his professional knowledge, allowed him to stand in the distinct position of being able to mitigate or prevent the dangerousness of his patient and the ability to "take whatever steps [were] necessary under the circumstances, including possibly warning the intended victim or notifying law enforcement officials." *Petersen*, 100 Wn.2d at 427.

Based on the stark differences between the relationship in *Petersen* giving rise to a duty solely under § 315 and the § 319 take charge relationships described above,

---

Wn.2d at 223. In doing so, we were informed by the § 315 *Petersen* duty and, when defining the "take charge" duty, took the opportunity to clarify that our holding in *Petersen* was reliant on neither the public duty of the State nor the fact that the patient had at one time been civilly committed. *Id.* In fact, we clearly stated that whether the patient is an inpatient or an outpatient is immaterial. *Id.* Even under our prior interpretations of § 319, a provision that we have interpreted as requiring a greater amount of restraint over the third party, there is no prerequisite of actual control.

21

*Volk v. DeMeerleer*, No. 91387-1

we reject Ashby's and the Clinic's invitation to interpret the *Petersen* duty and the take charge duty as one in the same.[11] For this reason, the amount of control or the nature of control Ashby had over DeMeerleer is not determinative of whether Ashby was under a duty to act for the benefit of DeMeerleer's victims.

2.    *The § 315* Petersen *duty applies in the outpatient setting*

The duty owed by Ashby to DeMeerleer's victims was not based on any supposed control Ashby imposed over DeMeerleer, but was instead, like our holding in *Petersen*, based on the nature of the relationship between Ashby and DeMeerleer.

---

[11]We have never read *Petersen*, implicitly or expressly, as requiring that a relationship meet the requirements of both §§ 315 and 319 before a duty of care is imposed. Sections 316-319 define the "types of duties" that will meet the requirements of § 315, but we have never held that they are the only relationships that will trigger the § 315 duty to a putative victim. The dissent's argument otherwise is unavailing. Dissent at 3-4. Our holdings in both *Taggart* and *Binschus* were based not on the kind of special relationships that exist between psychotherapist and patient, but on those between former inmates and the state. *Binschus v. Dep't of Corr.*, 186 Wn.2d 573, 576, 582, 380 P.3d 468 (2016); *Taggart*, 118 Wn.2d at 200. It stands to reason in those cases we would limit our analysis to whether an actual take charge relationship exists, as this, rather than treatment, is the basis of the relationship. But we should not interpret those cases as standing for the proposition that a take charge relationship must exist here. This reasoning disregards our holding in *Petersen*— that a special relation may exist outside of § 319—particularly in the context of a relationship with a mental health professional. While the relationships defined in §§ 316-319 are *sufficient* to create a "special relation" duty, they are not *necessary*. Indeed, perhaps recognizing that the type of control required by § 319 did not exist under the facts of that case, when articulating the *Petersen* duty we relied solely on the general "special relation" definition in § 315(a) without any reference to § 319. *Tarasoff*, on which we relied in *Petersen*, also did not indicate any reliance on § 319, but instead based its duty solely on § 315. *Petersen*, 100 Wn.2d at 426-27. As we have interpreted §§ 315 and 319, § 315 states a general "special relation" standard that may be present in any number of factual scenarios fitting that definition, while § 319 embodies the so-called "take charge" relationship. Because *Petersen*'s duty is premised solely on § 315, not § 319 as asserted in the briefing, it would seem to imply that inasmuch as we have interpreted §§ 315 and 319, they state potentially overlapping but nevertheless distinct standards. Had the members of the *Petersen* court sought to base their duty on § 319, presumably they would have expressly stated their intent to do so.

22

Considering the competing policy implications of recognizing a duty in the mental health professional outpatient setting, our reasoning in *Petersen*, and our later interpretations of *Petersen*, we hold that after a special relationship is formed between a mental health professional and his or her outpatient satisfying *Restatement* § 315, the mental health professional is under a duty of reasonable care to act consistent with the standards of the mental health profession, in order to protect the foreseeable victims of his or her patient.

Because of the general common law rule of nonliability to third parties, to decide whether the law imposes a duty of care and to "determine the duty's measure and scope," we must weigh "'considerations of logic, common sense, justice, policy, and precedent.'" *Affil. FM Ins. Co. v. LTK Consulting Servs., Inc.*, 170 Wn.2d 442, 449, 243 P.3d 521 (2010) (plurality opinion) (internal quotation marks omitted) (quoting *Snyder v. Med. Serv. Corp. of E. Wash.*, 145 Wn.2d 233, 243, 35 P.3d 1158 (2001)). As we have explained, "'The concept of duty is a reflection of all those considerations of public policy which lead the law to conclude that a plaintiff's interests are entitled to legal protection against the defendant's conduct.'" *Id.* at 450. (internal quotation marks omitted) (quoting *Taylor v. Stevens County*, 111 Wn.2d 159, 168, 759 P.2d 447 (1988)); *see also* W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 53, at 357-58 (5th ed. 1984) ("'[D]uty' is not sacrosanct in itself, but is only an expression of the sum total of those considerations

23

*Volk v. DeMeerleer*, No. 91387-1

of policy which lead the law to say that the plaintiff is entitled to protection."). Using

our judgment, "we balance the interests at stake." *Affil. FM*, 170 Wn.2d at 450 (citing

*Hunsley v. Giard*, 87 Wn.2d 424, 435, 553 P.2d 1096 (1976)).

When considering whether to impose a duty on mental health professionals in

the outpatient setting, other courts have summarized the competing policy concerns

as follows:

> (1) [T]he psychotherapist's ability to control the outpatient; (2) the public's interest in safety from violent assault; (3) the difficulty inherent in attempting to forecast whether a patient represents a substantial risk of physical harm to others; (4) the goal of placing the mental patient in the least restrictive environment and safeguarding the patient's right to be free from unnecessary confinement; and (5) the social importance of maintaining the confidential nature of psychotherapeutic communications.

*Estates of Morgan*, 77 Ohio St. 3d at 297. The briefing recognizes, and we agree,

that these same policy concerns are at issue in the present case. We therefore address

each concern in turn to determine whether the *Restatement* § 315 duty recognized in

*Petersen* should be extended to the outpatient setting.

a)      Psychotherapists' ability to control outpatients

To be certain, in order for a special relation to exist under § 315 and impose

the corresponding duty, there must be some ability to "control" the third person's

conduct, or else the duty contemplated by us in *Petersen* would essentially be one of

strict liability. *See id.* at 298 ("'[C]ontrol' is 'used in a very real sense.'" (quoting

Fowler V. Harper & Posey M. Kime, *The Duty To Control the Conduct of Another,*

24

43 YALE L.J. 886, 891 (1934))). Still, courts that have failed to recognize a duty in the outpatient setting take an overly narrow view of the level of control necessary to impose the duty by believing that actual confinement or the deprivation of liberty is necessary. *Id.* 298-99. As one court explained, "In viewing the issue in this way, these courts fail to recognize that the duty to control the conduct of a third person is commensurate with such ability to control as the defendant actually has at the time." *Id.* at 299 (citing RESTATEMENT § 314 cmt. a, § 316 cmts. a, b, § 317 cmt. c, § 318 cmt. a; *Lundgren v. Fultz*, 354 N.W.2d 25, 27-28 (Minn. 1984); *McIntosh v. Milano*, 168 N.J. Super. 466, 483 n.11, 403 A.2d 500 (1979)).

Though the amount of control required to meet § 319 is not necessary to fulfill the § 315 special relationship, the different levels of control evidenced in that provision are telling of the drafters' intent. Considering the language of the *Restatement*, it seems that its drafters contemplated that "diverse levels of control" would "give rise to corresponding degrees of responsibility." *Id.* The illustrations of § 319 discuss scenarios in which potentially dangerous individuals are confined in private sanitariums and negligently released. *See* RESTATEMENT § 319 cmt. a, illus. 1 & 2. However, the plain language of § 319 is distinctively more broad, evidencing the diverse levels of control present in the *Restatement*. *See* RESTATEMENT § 319 ("One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a

25

duty to exercise reasonable care to control the third person to prevent him from doing such harm."). Similarly, § 320 imposes a duty to protect someone under custodial care, but the comments to that provision indicate "custody" is "more suggestive of restrictions on liberty." *See* RESTATEMENT § 320; *Estates of Morgan*, 77 Ohio St. 3d at 299. The court in *McIntosh*, a decision we relied on in *Petersen*, explained that "the illustrations appended to [§ 319], which are drawn in the context of a private hospital or sanitarium for the insane, are obviously not by way of limitation." 168 N.J. Super. at 483 n.11. We agree.

Even bearing in mind the lesser amount of control available to mental health professionals in the outpatient setting, sufficient control nevertheless exists to recognize the duty. There are a number of preventative measures mental health professionals can undertake in the outpatient setting, even without actual custodial control, which we reiterate is not required by § 319, in order to mitigate or prevent their patients' foreseeable violent. actions.[12] Given this reasoning, we find that absolute control is unnecessary, and the actions available to mental health professionals, even in the outpatient setting, weigh in favor of imposing a duty.

---

[12]As one court reasoned, steps in the outpatient setting can include closer monitoring of compliance with medications and of the patient's mental state, strong family involvement, and informing the patient that he faces involuntary hospitalization unless he remains compliant. *Estates of Morgan*, 77 Ohio St. 3d at 300.

26

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Volk v. DeMeerleer*, No. 91387-1

        b)      Public's interest in safety from violent assaults

As evidenced by this court's decision in *Petersen*, and by the *Tarasoff* court, society has a strong interest in protecting itself from mentally ill patients who pose a substantial risk of harm. *See Petersen*, 100 Wn.2d at 428-29; *Tarasoff*, 17 Cal. 3d at 440, 442; *see also* RCW 71.05.150 (defining involuntary commitment procedures for mentally disabled persons presenting a likelihood of serious harm). Both statutorily and through common sense, society relies on mental health professionals to identify and control such risks. *See* RCW 71.05.150. The mental health community therefore has a broad responsibility to protect society against the dangers associated with mental illness. *See Estates of Morgan*, 77 Ohio St. 3d at 301; *Lipari*, 497 F. Supp. at 190; *McIntosh*, 168 N.J. Super. at 489-90. This responsibility is analogous to the duty imposed on health care providers to warn others of their patients' contagious or infectious diseases. *See* WAC 246-100-021, -036; RCW 43.20.050(2)(f) (granting authority to State Board of Health to adopt rules to prevent and control infectious diseases). In *McIntosh*, the court explained that a patient's dangerous propensities "may affect [others] in much the same sense as a disease may be communicable. The obligation imposed by this court, therefore, is similar to that already borne by the medical profession in another context." 168 N.J. Super. at 490.

27

Given this reasoning, as well as Washington's acknowledgment of an analogous duty in the involuntary commitment setting, this factor also weighs in favor of imposing a duty on mental health professionals in the outpatient setting.

      c)     The difficulty in assessing mental health dangerousness

In *Petersen*, despite the difficulty in assessing whether a mental health patient posed a serious threat to himself or others, we held there that such difficulty did not justify a blanket denial of recovery. 100 Wn.2d at 428; *see also Estates of Morgan*, 77 Ohio St. 3d at 301. Although accurately assessing dangerousness is unquestionably difficult, "[t]he concept of due care adequately accounts for the difficulty of rendering a definitive diagnosis of a patient's propensity for violence." *Estates of Morgan*, 77 Ohio St. 3d 301. It is unrealistic to expect perfection in all mental health diagnoses, but requiring that mental health professionals use the standards of the mental health profession to arrive at the *informed* assessment of their patients' dangerousness is not an unworkable requirement. *See Lipari*, 497 F. Supp. at 192; *McIntosh*, 168 N.J. Super. at 482; *Tarasoff*, 17 Cal. 3d at 438; *Estates of Morgan*, 77 Ohio St. 3d at 301-02. "Mental health professionals . . . now accept these duties as established, appropriate features of clinical practice." Douglas Mossman, *The Imperfection of Protection through Detection and Intervention: Lessons from Three Decades of Research on the Psychiatric Assessment of Violence Risk*, 30 J. LEGAL MED. 109, 121 (2009).

28

Additionally, if predicting a patient's dangerousness without at least some amount of accuracy was not possible, mental health professionals would not be entrusted to do so for civil commitment or sexually violent predator proceedings when such determinations can result in an indefinite deprivation of liberty. *See* RCW 71.05.150(1)(a)(i) (requiring, as one basis for involuntary commitment, that the mental health professional determine that the patient present a likelihood of serious harm); RCW 71.09.050, .070, .090 (relying on expert mental health evaluations to determine whether individual likely to engage in predatory acts of sexual violence if not confined in a secure facility). This factor weighs in favor of imposing a duty as well.

> d)    The goal of placing the mental patient in the least restrictive environment and safeguarding the patient's right to be free from unnecessary confinement

A primary goal of the mental health profession is to place patients in the least restrictive environment necessary. *In re Det. of J.S.*, 124 Wn.2d 689, 701, 880 P.2d 976 (1994) ("Certainly RCW 71.05 [the mental illness statutory scheme] expresses a public policy goal that treatment be offered in the least restrictive setting reasonably available."); *Estates of Morgan*, 77 Ohio St. 3d at 302 (citing *Perreira v. State*, 768 P.2d 1198, 1219 (Colo. 1989)). To be certain, "[m]ental hospitals are not dumping grounds for all persons whose behavior might prove to be inconvenient or offensive to society." *Estates of Morgan*, 77 Ohio St. 3d at 302 (citing *O'Connor v.*

29

*Donaldson*, 422 U.S. 563, 575, 95 S. Ct. 2486, 45 L. Ed. 2d 396 (1975)). Individual liberty interests are also constitutionally protected by both the state and federal constitutions. *See* WASH. CONST. art. I, § 3; U.S. CONST. amend. XIV. However, the fear that imposing this duty on mental health professionals will increase improper civil commitments appears to be unfounded. *Estates of Morgan*, 77 Ohio St. 3d at 302 (citing Daniel J. Givelber, et al., *Tarasoff, Myth and Reality: An Empirical Study of Private Law in Action*, 1984 WIS. L. REV. 443, 486 ("*Tarasoff* has not discouraged therapists from treating dangerous patients, nor has it led to an increased use of involuntary commitment of patients perceived as dangerous.")).

The standard under consideration does not impose liability merely because the mental health professional chose to place his or her patient in a less restrictive environment, provided that decision was informed by the standards of the profession and made with due care. *See Lipari*, 497 F. Supp. at 192-93 ("This argument misinterprets the nature of the duty imposed upon the therapist. The recognition of this duty does not make the psychotherapist liable for any harm caused by his patient, but rather makes him liable only when his negligent treatment of the patient caused the injury in question . . . . Thus . . . a psychotherapist is not subject to liability for placing his patient in a less restrictive environment, so long as he uses due care in assessing the risks of such a placement. This duty is no greater than the duty already owing to the patient."). Because of the lack of evidence indicating that *Tarasoff* has

30

increased the amount of improper civil commitments or decreased mental health professionals' acceptance of potentially dangerous clientele, this factor weighs in favor of imposing a duty.

e) The social importance of maintaining the confidential nature of psychotherapeutic communications

Like Ashby, the doctor in *McIntosh* argued that disclosure pursuant to a *Tarasoff*-like duty would have "socially undesirable ramifications." *McIntosh*, 168 N.J. Super. at 490. Washington, like New Jersey at the time *McIntosh* was decided, has codified the physician-patient privilege. *Id.* The *McIntosh* court noted, however, that the psychologist-patient privilege must in some cases give way to "'supervening interest of society,'" in the same way the attorney-client privilege may not be used to "protect or conceal" the commission of a crime. *Id.* (quoting *Hague v. Williams*, 37 N.J. 328, 336, 181 A.2d 345 (1962)). The *McIntosh* court also considered the American Medical Association's *Principles of Medical Ethics* (1957), https://www.ama-assn.org/sites/default/files/media-browser/public/ethics/1957_principles_0.pdf [https://perma.cc/3JYE-CLFH], which was adopted in large part by the psychiatric profession. 168 N.J. Super. at 491.

The psychiatric profession's ethical considerations required that psychiatrists be circumspect in protecting patient disclosures and that release of information occur only when authorized by the patient or required by law. *Id.*; *see also* RCW 70.02.230(6)(a) (providing a right of action and minimum recovery amount for the

31

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

improper disclosure of mental health records by a mental health provider). Nevertheless, one exception to the disclosure limitations, the *McIntosh* court explained, was "to protect the patient or the community from imminent danger." 168 N.J. Super. at 491 (citing *The Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry*, 130 AM. J. PSYCHIATRY 1058, 1063 (1973)).[13] Based on these considerations, the *McIntosh* court concluded, "[C]onsiderations of confidentiality have no over-riding influence here." *Id.* at 493.

Neither the concern expressed by the *Petersen* court regarding disclosure nor the medical standards have changed since we decided *Petersen* in 1986. We recently explained that despite the protection afforded mental health records by chapter 70.02 RCW and the Health Insurance Portability and Accountability Act of 1996 Pub. L. No. 104-191, 110 Stat. 1936, the protection is conditional and will yield to greater societal interests. *State v. Sanchez*, 177 Wn.2d 835, 849, 306 P.3d 935 (2013); *see* RCW 70.02.230(2)(h)(i) (allowing for the disclosure of otherwise confidential information by mental health professionals to persons whose "health and safety has been threatened").

---

[13]Of note, the American Psychiatric Association (APA) continues to utilize the standards quoted in *McIntosh*. Section 4 states, "A physician shall respect the rights of patients, colleagues, and other health professionals, and shall safeguard patient confidences and privacy within the constraints of the law." APA, THE PRINCIPLES OF MEDICAL ETHICS: WITH ANNOTATIONS ESPECIALLY APPLICABLE TO PSYCHIATRY 2 (2013 ed.), http://www.psychiatry.org/psychiatrists/practice/ethics. Still, the comments to section 4 permit disclosure "[w]hen, in the clinical judgment of the treating psychiatrist, the risk of danger is deemed to be significant." *Id.* at 7 (cmt. 8).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Volk v. DeMeerleer*, No. 91387-1

This conditionality is premised on overriding societal concerns, such as preventing harm to anyone who might foreseeably be endangered by a patient's dangerous propensities. Nationally, required disclosure has "'had a minimal or positive effect on the psychotherapeutic relationship.' Because 'almost half of the targets of patients' threats were family members, spouses, boyfriends, or girlfriends . . . the *Tarasoff* type of situation,' rather than being detrimental for treatment, 'may hold promise for family-oriented therapeutic interventions.'" Mossman, *supra*, at 119 (alteration in original) (quoting Renee L. Binder & Dale E. McNeil, *Application of the Tarasoff Ruling and Its Effect on the Victim and the Therapeutic Relationship*, 47 PSYCHIATRIC SERVS. 1212, 1212 (1996); Dale E. McNeil et al., *Management of Threats of Violence Under California's Duty-To-Protect Statute*, 155 AM. J. PSYCHIATRY 1097, 1100 (1998)).

Given society's strong interest in preventing violent attacks by mentally ill patients, as well as the recognition that the mental health profession has long accepted a duty of disclosure when a potential victim's safety is in jeopardy, this factor weighs in favor of imposing a duty.

    f)  Precedential support for expanding *Petersen* duty to outpatient setting

In addition to the above policy considerations, our subsequent interpretations of *Petersen*, as well as our reasoning in *Petersen*, are relevant to the imposition of a

33

*Volk v. DeMeerleer*, No. 91387-1

duty and warrant extension of the § 315 duty to the outpatient setting. *See Affil. FM*, 170 Wn.2d at 449.

First, as we have subsequently interpreted *Petersen*, custodial control is not a prerequisite to the imposition of the § 315 *Petersen* duty, and the duty should apply equally to the outpatient setting provided a special relation exists. Ashby is correct that the doctor/patient relationship in *Petersen* arose in the context of involuntary civil commitment. However, the language in *Petersen* used to describe the duty psychologists owe to the victims of their patients' criminal or tortious conduct was not limited to civilly committed individuals. Instead, *Petersen*, and subsequent interpretations of § 315, implies that regardless of the setting in which the special relationship is formed, as soon as it exists, the mental health professional may be liable to the reasonably foreseeable victims of his or her patient based solely on that relationship rather than any hypothetical ability to confine or control the patient. *See Hertog*, 138 Wn.2d at 280 ("The psychiatrist in *Petersen* had no authority to confine the patient without seeking a court order. Similar to the circumstances in *Petersen*, the fact that a probation counselor cannot act on his or her own to arrest a probationer or to revoke probation is not dispositive on the issue of duty."). We also spoke directly to this point in *Taggart*, where we clarified that the § 315 *Petersen* duty did not require control and was, therefore, not limited to the inpatient setting. There, we stated:

34

> The duty we announced in *Petersen* is not limited to taking precautions to protect against mental patients' dangerous propensities only when those patients are being released from the hospital . . . . The duty requires that *whenever* a psychiatrist determines, or according to the standards of the profession should have determined, that a patient presents foreseeable dangers to others, the psychiatrist must take reasonable precautions to protect against harm. *Whether the patient is a hospital patient or an outpatient is not important.* Thus in *Tarasoff v. Regents of Univ. of Cal.*, 17 Cal. 3d 425, 551 P.2d 334, 131 Cal. Rptr. 14 (1976), which we followed in *Petersen*, negligent release from the hospital was not an issue; the patient who murdered the plaintiffs' daughter was not a hospital patient. Similarly, in *Lipari v. Sears, Roebuck & Co.*, 497 F. Supp. 185 (D. Neb. 1980), which we also followed in *Petersen*, a patient at a psychiatric clinic fired a shotgun into a crowded nightclub. The patient was a day-care patient — so, again, release was not an issue — yet the court found that the defendant therapist had a duty to anyone foreseeably endangered by the patient's negligent care. 497 F. Supp. at 194.

118 Wn.2d at 223 (emphasis added). The interpretations unambiguously permit the extension of the § 315 *Petersen* duty to the outpatient setting.

Second, the *Petersen* court's reliance on *Tarasoff* authorizes an extension of the duty to the outpatient setting, especially in light of the fact that *Tarasoff* itself arose in a voluntary outpatient/mental health professional relationship. *See Tarasoff*, 17 Cal. 3d at 432. Similarly, the three cases we relied on in *Petersen* for the proposition that a special relationship may impose a duty to victims, involved either outpatient treatment or release from *voluntary* confinement resulting in the amount of control akin to an outpatient/mental health professional relationship. *See Lipari*, 497 F. Supp. at 185; *McIntosh*, 168 N.J. Super. at 493; *Bradley Ctr., Inc. v. Wessner*, 161 Ga. App. 576, 577, 287 S.E.2d 716 (1982). Though our decision in *Petersen*

35

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

dealt with a special relationship that originated from an involuntary commitment, we never explicitly or implicitly attempted to confine the duty to only the facts of that case.

    g)  Balancing outcome

Without question, mental health professionals face an incredibly difficult task in ascertaining whether a patient will act violently. Nevertheless, the § 315 *Petersen* duty does not require that the mental health professional make the correct determination of dangerousness every time the professional forms a mental health professional/outpatient relationship. To impose such a burden not only would be untenable given medical technology and the unpredictability of the human psyche but would expose psychiatrists to insurmountable costs in defending lawsuits for each incorrect conclusion. What the current standard would require, however, is the same duty imposed by *Tarasoff* and adopted by us in *Petersen*—to act with reasonable care, informed by the standards and ethical considerations of the mental health profession, when identifying and mitigating the dangerousness of psychiatric patients.

> Once such a patient is identified, the duty imposed by reasonable care depends on the circumstances: reasonable care may require providing appropriate treatment, warning others of the risks posed by the patient, seeking the patient's agreement to a voluntary commitment, making efforts to commit the patient involuntarily, or taking other steps to ameliorate the risk posed by the patient. In some cases, reasonable care may require a warning to someone other than the potential victim, such

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

as parents, law-enforcement officials, or other appropriate government officials.

RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 41 cmt. g (AM. LAW INST. 2012).

Accordingly, we hold that once a mental health professional and his or her outpatient form a special relationship that satisfies the requirements of *Restatement* § 315, the mental health professional is under a duty of reasonable care to act consistent with the standards of the mental health profession and to protect the foreseeable victims of his or her patient. Failing to recognize the duty owed by mental health professionals to the foreseeable victims of their outpatients would foreclose a legitimate cause of action and would inform the victims that their rights are not worthy of legal protection against the dangerous conduct of mental health outpatients. It is our belief that this standard fairly balances the needs of protecting the public, allowing recovery for victims of psychiatric patients' crimes, and providing the necessary protection for mental health professionals to perform their jobs. Granting absolute immunity to health care professionals in the outpatient setting would "disrupt that delicate balance." *Taggart*, 118 Wn.2d at 232 (Utter, J., concurring).

3. *Application to the present case*

Ashby and DeMeerleer had a psychiatrist/outpatient relationship that spanned nearly nine years. Ashby also conceded that he and DeMeerleer shared a special

relationship for the purposes of *Petersen*. The existence of this relationship triggered the duty expressed in § 315 of the *Restatement* and defined by the *Petersen* court, whereby Ashby had a duty to take reasonable precautions to protect anyone who might foreseeably be endangered by DeMeerleer's dangerous propensities.

At several different meetings, DeMeerleer informed Ashby of suicidal and homicidal thoughts. DeMeerleer never specifically named Schiering or her children, but this was not required by *Petersen*.[14] Ashby knew of DeMeerleer's history of suicidal and homicidal thoughts, knew that DeMeerleer had attempted to act out suicide and retribution at different times, recognized that DeMeerleer was unstable at their last meeting, and knew that DeMeerleer had a history of noncompliance with his antipsychotic medications. Knoll, Volk's expert forensic psychology witness, opined that during DeMeerleer's divorce his negative fantasies were directed at his ex-wife and her lover, and that inquiry into DeMeerleer's state of mind prior to the attack may have revealed similar thoughts directed at Schiering and her children.

Knoll's affidavit states that Ashby's failure to schedule additional meetings, follow up with DeMeerleer, and monitor DeMeerleer's condition was a breach of professional standards and was a causal and substantial factor of the harms that befell Schiering and her sons. The only evidence proffered by Ashby and the Clinic to

---

[14]As explained above, *supra* note 7, we rejected a limitation on the *Petersen* duty that would require that victims be readily identifiable and instead opted to impose a duty to *any* foreseeable victims.

rebut this contention was several affidavits from DeMeerleer's family and friends wherein they stated that DeMeerleer did not outwardly evince any indication that he would act violently. None of the affidavits supplied by Ashby and the Clinic speak to the professional psychiatric standards with which Ashby was to comply.

Based on the factual underpinnings of this case, as well as Ashby's concession that a special relationship existed between him and DeMeerleer, the § 315 special relationship requirements were met. "Once the theoretical duty exists, the question remains whether the injury was reasonably foreseeable." *Joyce*, 155 Wn.2d at 315 (citing *Taggart*, 118 Wn.2d at 226; RESTATEMENT § 319). Whether DeMeerleer's actions were foreseeable, however, is a question of fact that should have been resolved by a jury. *Seeberger v. Burlington N. R.R. Co.*, 138 Wn.2d 815, 823, 982 P.2d 1149 (1999) (citing *McLeod v. Grant County Sch. Dist. No. 128*, 42 Wn.2d 316, 323, 255 P.2d 360 (1953)). Summary judgment was therefore inappropriate because at a minimum, viewing the facts in the light most favorable to Volk, Knoll's affidavit created a genuine issue of material fact as to whether, based on the standards of the mental health profession, the harms experienced by Schiering and her family were foreseeable.

B.   The Court of Appeals erred in stating that there are two levels of speculative expert testimony permitted at summary judgment and trial and by using this reasoning in its decision

Ashby contends that the expert testimony of Knoll should have been stricken because it was overly speculative in nature. Ashby primarily takes issue with the Court of Appeals' decision where it held Knoll's testimony was permissible based on a differing level of permissible speculation at the summary judgment stage. Specifically, the Court of Appeals reasoned:

> [T]he law likely recognizes two levels of speculation: one for purposes of summary judgment, and one for purposes of finding facts after an evidentiary hearing or trial. We do not consider Dr. Knoll's testimony speculative for purposes of defending a summary judgment motion.

*Volk*, 184 Wn. App. at 432. The Court of Appeals offered no precedential support and no reasoning for its bifurcated analysis, nor does Volk defend the Court of Appeals' reasoning. Because the Court of Appeals' reasoning is unsupported by Washington law, we reject the view that there are differing standards of speculation permitted at the summary judgment and evidentiary phases.

Still, despite Ashby's disagreement with Knoll's conclusions, the trial court did not err by admitting Knoll's affidavit. ER 702 states that a court may permit a witness qualified as an expert to provide an opinion regarding "'scientific, technical, or other specialized knowledge'" if such testimony "'will assist the trier of fact.'" *State v. Yates*, 161 Wn.2d 714, 762, 168 P.3d 359 (2007) (quoting *State v. Cauthron*, 120 Wn.2d 879, 890, 846 P.2d 502 (1993), *overruled in part on other grounds by*

40

*Volk v. DeMeerleer*, No. 91387-1

*State v. Buckner*, 133 Wn.2d 63, 941 P.2d 667 (1997)). Admission is proper provided the expert is qualified and his or her testimony is helpful. *Id.* The expert's opinion must be based on fact and cannot simply be a conclusion or based on an assumption if it is to survive summary judgment. *Melville v. State*, 115 Wn.2d 34, 41, 793 P.2d 952 (1990). Unreliable testimony is not considered helpful to the trier of fact and should be excluded. *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 918, 296 P.3d 860 (2013) (citing *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 600, 260 P.3d 857 (2011)). Importantly, speculation and conclusory statements will not preclude summary judgment. *Elcon Constr., Inc. v. E. Wash. Univ.*, 174 Wn.2d 157, 169, 273 P.3d 965 (2012) (citing *Greenhalgh v. Dep't of Corr.*, 160 Wn. App. 706, 714, 248 P.3d 150 (2011)). The concern about speculative testimony is that the trier of fact will be forced to speculate as to causation without an adequate factual basis. *Little v. King*, 160 Wn.2d 696, 705, 161 P.3d 345 (2007).

When Washington courts have previously refused to admit expert testimony as speculative, admission hinges on the expert's basis for forming the opinion, not on the expert's conclusions. When an expert fails to ground his or her opinions on facts in the record, courts have consistently found that the testimony is overly speculative and inadmissible. *See, e.g., Moore v. Hagge*, 158 Wn. App. 137, 241 P.3d 787 (2010); *State v. Johnson*, 150 Wn. App. 663, 208 P.3d 1265 (2009); *State*

41

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Volk v. DeMeerleer*, No. 91387-1

*v. Lewis*, 141 Wn. App. 367, 166 P.3d 786 (2007); *Doyle v. Nor-W. Pac. Co.*, 23 Wn. App. 1, 5-6, 594 P.2d 938 (1979).

Although Ashby and the Clinic disagree with Knoll's conclusions, his opinions, when considered in light of previous determinations on speculative testimony, are admissible. Knoll was familiar with the standard of care in Washington State through his consultation with a psychiatric colleague in Washington. CP at 83-84. Knoll has an extensive background in psychiatric treatment and related psychiatric clinical issues. *Id.* Knoll opined that Ashby failed to meet the requisite standard of care for psychiatrists practicing in Washington by failing to follow up with DeMeerleer, make a focused inquiry into DeMeerleer's condition, adequately assess DeMeerleer's suicidal and homicidal risks, and monitor DeMeerleer's condition and response to treatment. CP at 87-90. Knoll based his opinion on DeMeerleer's clinical records, law enforcement files and reports surrounding the attack, and autopsy and toxicology reports. CP at 83. Given Knoll's reliance on the record, the factual underpinnings of the case, and DeMeerleer's treatment history with Ashby, his opinions were not speculative and the trial court did not err by considering them for summary judgment.

C.    The loss of chance doctrine is inapplicable to the facts of this case

As part of Volk's medical malpractice claim, she asserts that Ashby's allegedly deficient treatment resulted in a loss of a chance for survival and better

42

outcome for Schiering and her sons. Ashby contends that in order to establish a loss of chance claim, an expert opinion must state the conclusion in terms of a percentage of lost chance. We need not reach Ashby's argument about the requirement for an actual percentage. We affirm and hold the loss of chance doctrine does not apply to Volk's claim.

In Washington, the loss of chance can be a compensable injury in a medical malpractice action. *Mohr v. Grantham*, 172 Wn.2d 844, 857, 262 P.3d 490 (2011) (permitting loss of chance for a better outcome between doctor and negligently treated patient); *Herskovits v. Grp. Health Coop. of Puget Sound*, 99 Wn.2d 609, 664 P.2d 474 (1983) (plurality opinion) (permitting loss of chance claim between doctor and estate of negligently treated patient); *Rash v. Providence Health & Servs.*, 183 Wn. App. 612, 334 P.3d 1154 (2014) (permitting loss of chance claim between negligently treated patient and provider), *review denied*, 182 Wn.2d 1028, 347 P.3d 459 (2015).

Volk contends that the loss of chance may also be a substitute for the requirement of actual, "but for" causation, citing to Justice Dore's lead opinion in *Herskovits*, 99 Wn.2d at 616. Under either formulation, the plaintiff still bears the burden of proving duty, breach, causation, and harm—the approaches differ only in the determination of causation and in the ultimate harm. *Mohr*, 172 Wn.2d at 857.

Volk claims Ashby's negligence caused Schiering and her family's entire chance for survival to be lost. This argument fails under either approach because the loss of a chance doctrine is inapplicable if the plaintiff is alleging that the defendant's negligence actually caused the unfavorable outcome—the tortfeasors would then be responsible for the actual outcome, not for the lost chance. *See* Alice Férot, *The Theory of Loss of Chance: Between Reticence and Acceptance*, 8 FLA. INT'L U. L. REV. 591, 596 (2013) ("If the patient had a 100% chance to be cured or saved and the tortious act of the physician caused all this chance to be lost, then the tortfeasor is responsible for the unfavorable outcome, not the loss of chance."). Further, this claim is indistinguishable from Volk's medical negligence claim, as Volk alleges the same duty, the same negligent actions, and the same harm.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

## IV. CONCLUSION

We hold that 1) a special relationship existed between Ashby and DeMeerleer requiring Ashby to affirmatively protect the foreseeable victims of DeMeerleer, 2) Volk's expert witness testimony was not overly speculative but the Court of Appeals erred by applying its differing levels of speculation analysis, and 3) the loss of chance doctrine does not apply to Volk's claim. Accordingly, we reverse in part, and affirm in part, the Court of Appeals' decision, and remand the case to the trial court so that it may resolve Volk's medical negligence claim.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Volk v. DeMeerleer*, No. 91387-1

_____
Fairhurst, J.

WE CONCUR:

_____
_____

_____
_____

Gonzáles, J.

_____
McCloud, J.

_____
Yu, J.

46

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Volk (Beverly R.) et al. v. DeMeerleer (James B.) et al.*

No. 91387-1

WIGGINS, J. (dissenting)—I agree with the majority on one of two points. I agree that medical malpractice suits are generally not available to nonpatient third parties. Majority at 12. We have never recognized a claim for medical malpractice brought by a nonpatient third party against a physician. *See Paetsch v. Spokane Dermatology Clinic, PS*, 182 Wn.2d 842, 850 n.6, 348 P.3d 389 (2015). I therefore join in the majority's opinion to the extent that it reverses the Court of Appeals on this issue and rejects Beverly Volk's medical malpractice claim.

However, I do not agree that Volk presented a viable medical negligence claim. Indeed, our analysis should end upon establishing the medical malpractice claim's failure. While the majority proceeds to take up Volk's medical negligence claim, Washington law establishes medical malpractice as the exclusive means of recovery for a health-care-related injury: "No award shall be made in any action . . . for damages for injury occurring as the result of health care," except in the following three circumstances: (1) where the health care provider failed "to follow the accepted standard of care," (2) where the provider "promised . . . that the injury suffered would not occur," or (3) where the patient did not consent to treatment that resulted in injury. RCW 7.70.030. The first category describes negligence actions.[1] Here, the claim

---

[1] *See* 16 DAVID K. DEWOLF & KELLER W. ALLEN, WASHINGTON PRACTICE: TORT LAW AND PRACTICE § 16:4, at 674-75 (4th ed. 2013) (noting that medical negligence claims are brought under RCW 7.70.030).

*Volk (Beverly R.) et al. v. DeMeerleer (James B.) et al.*
(Wiggins, J., dissenting)

fails to meet the requirements for medical malpractice; thus the party cannot recover "for injury occurring as the result of health care," *id.*, as the majority permits here, majority at 13.

Even if we allow for a medical negligence claim outside the medical malpractice framework, I strongly disagree with the majority's interpretation of *Restatement (Second) of Torts* §§ 315-319 (Am. Law Inst. 1965) (*Second Restatement*), and with the majority's unheralded adoption of the substantially broadened *Restatement (Third) of Torts: Liability for Physical and Emotional Harm* § 41 (Am. Law Inst. 2012) (*Third Restatement*).[2] The *Second Restatement* § 315 states that "[t]here is no duty to so control the conduct of a third person . . . unless . . . a special relation exists." The *Third Restatement*, however, and the majority's holding, would broaden the special relationship exception to encompass any mental health professional, and by its reasoning any ongoing relationship of influence, regardless of that person's ability or inability to exercise the control required.

This expansion of liability is unsupported either by our case law or by the *Second Restatement* §§ 315-319; the majority functionally adopts the *Third Restatement* § 41, declining to find any capacity for control before imposing a duty to control. Such a substantial transition should be made plainly, explicitly, and only after full discussion and careful consideration—none of which has happened here.

---

[2] The *Third Restatement* § 41 explicitly replaces the *Second Restatement* §§ 315(a), 316, 317, and 319. *See* RESTATEMENT (THIRD) § 41 cmt. a.

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Volk (Beverly R.) et al. v. DeMeerleer (James B.) et al.*
(Wiggins, J., dissenting)

Nor do I think such an expansion of liability is wise, as it singles out mental health professionals to uniquely answer for the actions of others against third parties. Moreover, broadening the duties and potential liabilities of these professionals threatens to chill critical mental health services, while sparking unnecessary litigation.

For these reasons, I respectfully dissent.

I. The *Second Restatement* Does Not Establish a Duty To Control Where There Is No Ability To Control

Generally, there is no duty to protect third parties from the actions of others. At issue is the *Second Restatement* § 315(a) exception to this rule: Where a "special relation" exists with the person causing the harm, there is a duty to control the person so as to prevent harm to a third party. We have adopted this provision as an exception to Washington common law, which generally precludes tort liability for the actions of others against third parties. *See Petersen v. State*, 100 Wn.2d 421, 426, 671 P.2d 230 (1983) (citing *Lipari v. Sears, Roebuck & Co.*, 497 F. Supp. 185, 188 (D. Neb. 1980)).

The *Second Restatement* enumerates instances of such special relationships in the subsequent sections, §§ 316-319. *See Hertog v. City of Seattle*, 138 Wn.2d 265, 277, 979 P.2d 400 (1999) (noting that there are "several special relationships described in the RESTATEMENT (SECOND) OF TORTS," with § 319 being most relevant to that case); *see also Taggart v. State*, 118 Wn.2d 195, 219, 822 P.2d 243 (1992) (noting the sections following § 315 "define various 'special relations' that, in accordance with the general principle stated in § 315, give rise to a duty to control a third person"). As

3

*Volk (Beverly R.) et al. v. DeMeerleer (James B.) et al.*
(Wiggins, J., dissenting)

§ 315 *requires* a party to exercise control, the ensuing sections list relationships *allowing* for such control.

This understanding is consistent with our approach to third-party liability in *Binschus v. Department of Corrections*, 186 Wn.2d 573, 578-81, 380 P.3d 468 (2016). In that case, we considered what special quality triggers a § 315 special relationship, thereby creating a duty to control the conduct of others. "Crucial to our analysis," we emphasized, "is the nature of that duty: 'to *control* the third person's conduct.'" *Id.* at 578 (internal quotation marks omitted) (quoting RESTATEMENT (SECOND) OF TORTS § 315). In *Binschus*, we explained that some of our case law may be misinterpreted to suggest that there is "a broad duty to prevent all reasonably foreseeable dangers" independent of the ability to control. *Id.* at 580 (noting that certain concluding language in *Taggart* "can be taken out of context"). Thus, we clarified:

> [A] "duty . . . to control" is, indeed, a duty to *control*. We did not previously, and do not today, expand it to a general duty to prevent a person from committing criminal acts in the future.

*Id.* at 580-81 (second alteration in original) (quoting RESTATEMENT (SECOND) OF TORTS § 319). In contrast to this careful cabining of §§ 315 to 319 duties, here the majority asserts that "there is no prerequisite of actual control" before imposing a duty to control. Majority at 21 n.10. This result we plainly foreclosed in *Binschus*.

Nor is the majority's interpretation consistent with the language of the *Second Restatement* §§ 315 to 319. When we interpret nonexclusive lists, we follow the interpretational canon of ejusdem generis. Ejusdem generis requires that "'specific terms modify or restrict the application of general terms where both are used in

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

sequence.'" *State v. Otton*, 185 Wn.2d 673, 700, 374 P.3d 1108 (2016) (Gordon McCloud, J., concurring) (internal quotation marks omitted) (quoting *State v. Stockton*, 97 Wn.2d 528, 532, 647 P.2d 21 (1982)). In the *Second Restatement*, the general term is § 315, titled "General Principle"; the special relationships in the following sections (each describing a specific "Duty") constitute the specific terms. The feature common to the enumerated specific sections is the ability to exercise control in the special relationship: § 316 describes a parent's control over a child; § 317 describes a master's control over a servant; § 318 describes a landowner's control over the use of his/her land;[3] and § 319 describes a person's duty to exert control when taking charge of another. *See Binschus*, 186 Wn.2d at 581 n.3 ("[T]he concept of 'control' must be a part of any § 319 analysis."). Thus, the list, §§ 316-319, while not exclusive, narrows the scope of special relationships to those situations where the ability to control exists. This narrowing is also logical, as without the *ability* to control, the § 315 requirement to *exercise* control would be to no effect; one cannot use what one does not have. Critically, this requirement to exercise "control" is shed by the *Third Restatement*, instead requiring "reasonable care." RESTATEMENT (THIRD) OF TORTS § 41(a).

In contrast to the language of the *Second Restatement*, the majority seeks to impose the § 315 duty to control on an outpatient relationship in which the ability to control is expressly absent. Volk concedes that Howard Ashby lacked the ability to

---

[3] More specifically, the *Second Restatement* § 318(a) confines any duty owed by a landowner to those situations in which "he has the ability to control" the person using or in possession of his land.

*Volk (Beverly R.) et al. v. DeMeerleer (James B.) et al.*
(Wiggins, J., dissenting)

control his outpatient James DeMeerleer; this lack was the reason for the failure of Volk's § 319 argument, as § 319 imposes a duty to control when one "takes charge" of a dangerous person. Where the duty to exert control is required by § 315, I cannot agree with the majority's assertion that "the amount of control or the nature of control [in the relationship] . . . is not determinative" for a *Second Restatement* analysis. Majority at 21-22.

The majority further holds that a "definite, established, and continuing relationship" is sufficient to create a "duty to protect against foreseeable dangers" under § 315. *Id.* at 14-15 (citing *Honcoop v. State*, 111 Wn.2d 182, 193, 759 P.2d 1188 (1988)). However, in *Honcoop*, we refused to impose a § 315 duty to protect third parties precisely because there was a lack of control. 111 Wn.2d at 193 ("Regulatory control over a third party is not sufficient to establish the necessary control which can give rise to an actionable duty."). We declined to broaden the scope of the special relationship beyond the sphere of an ability to control.

In *Petersen*, we similarly found that there was an ability to exercise control before imposing a § 315 duty to exercise control: In *Petersen*, the dangerous party was involuntarily incarcerated and subject to the control of doctors and hospital staff. 100 Wn.2d at 423-24. *Petersen* does not stand for the proposition that any therapist-patient relationship constitutes a special relationship, triggering a duty to exercise control; rather, it acknowledged that control existed, and from there required that control be exercised. We recently restated this interpretation of *Petersen*, highlighting that "the injury to the plaintiff was a foreseeable consequence of the failure to *control*

6

*Volk (Beverly R.) et al. v. DeMeerleer (James B.) et al.*
(Wiggins, J., dissenting)

the patient." *Binschus*, 186 Wn.2d at 582. The majority's contention that "under *Petersen*, . . . a duty exists without regard for the 'control' principle" is thus novel and contradicted by our language in *Binschus*. Majority at 21.

In its holding, the majority would expand the duty to intervene for the benefit of third parties wherever a "definite, established, and continuing relationship" exists; while appearing to apply this definition only to mental health professionals pursuant to the *Third Restatement* § 41 comment g, the majority's reasoning could easily encompass teammates, partners, and other ongoing relationships in which control is absent but influence exists. Imposing a duty to protect third parties from the actions of others wherever a "definite, established, and continuing relationship exists" is unsupported by our case law or the *Second Restatement*. I can conclude only that the majority instead invokes and quietly adopts the expansive language of the *Third Restatement*, free of the need for "control."

II. The *Third Restatement* Would Substantially Broaden Liability to Third Parties Who Are Injured by Others

The *Third Restatement* § 41, as adopted by the majority, departs substantially from the *Second Restatement* §§ 315 to 319. Rather than requiring a controlling relationship before imposing a duty to exercise control, the *Third Restatement*'s comments explicitly state that control is not necessary in mental health contexts.[4]

---

[4] *See* RESTATEMENT (THIRD) OF TORTS § 41 cmt. g (noting that "reasonable care may require providing appropriate treatment, warning others of the risks posed by the patient, seeking the patient's agreement to a voluntary commitment, making efforts to commit the patient involuntarily, or taking other steps to ameliorate the risk posed by the patient"). Thus, a practitioner could be expected to violate patient confidentiality by contacting county-

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Volk (Beverly R.) et al. v. DeMeerleer (James B.) et al.*
(Wiggins, J., dissenting)

Under the *Third Restatement*, the ability to seek the involuntary commitment of an outpatient is sufficient to give rise to a duty to act.

As a result of the majority's holding, a special relationship invoking an uncommon duty to act to protect third parties from others is imposed, not merely on the basis of relationships of control—be it master and servant, parent and child—but on the basis of *any* relationship of influence that is "definite, established, and continuing." Majority at 21. Control is unnecessary; action must be taken where "reasonable." *Id.* at 22-23. This decision strays far from describing a narrow exception imposing liability only for the actions of those already within one's control; instead, the exception swallows the rule.

Notably, the *Third Restatement* § 41(b)(4), concerning the liability of mental health professionals, has not been explicitly adopted by any state, nor have the implications of its adoption been fully explored. On the contrary, where § 41 has been considered in other states, those courts have declined to rely on it. *See Kuligoski v. Brattleboro Retreat*, 2016 VT 54, ¶ 44, __ A.3d __ (2016) ("Although we have discussed it above for background, we have not adopted and relied upon § 41(b)(4) of the *Restatement (Third) of Torts*.").[5] Here, the majority sheds the *Second*

_____

designated mental health professionals, who would then evaluate the case and, in their discretion, petition the court for involuntary commitment of a given patient. RCW 71.05.150(1)(a)-(b). A patient could then be involuntarily committed if there is evidence that the patient's actions "constitute a likelihood of serious harm" or that the patient is otherwise severely disabled. RCW 71.05.160.

[5] Massachusetts's Supreme Judicial Court noted the changes promulgated by the *Third Restatement* in its 2009 *Leavitt v. Brockton Hospital, Inc.* case, but neither explicitly adopted it nor discussed its implications. 454 Mass. 37, 41, 907 N.E.2d 213 (2009); *see also Roe*

8

*Volk (Beverly R.) et al. v. DeMeerleer (James B.) et al.*
(Wiggins, J., dissenting)

*Restatement*'s "control" principle and adopts instead broad new liability inherent in the *Third Restatement;* yet this step is taken without carefully considering the ramifications of such a transition.

If it is indeed appropriate to so broaden the duty to answer for the actions of others, it behooves us to articulate the precise scope of this new duty, to whom it will apply, and why we make such a change.

### III. Public Policy Does Not Support Broadening Liability for Acts by Others Where There Is No Ability To Control

The majority supports the imposition of broad liability on mental health professionals by highlighting the public's interest in safety from violent assaults by the mentally ill. Majority at 26-27. While I agree that there is a strong policy interest in protecting the public, imposing liability on mental health professionals for the potential actions of their patients seems an uncertain means of achieving this public protection.

The majority accepts as unquestioned the proposition that expanding liability advances the public's interest in safety; yet there are a number of reasons why this may not be the case: First, excessive involuntary commitment greatly harms those unnecessarily confined.[6] *See* Br. of Amicus Curiae of Wash. State Psychological Ass'n at 10-11. Second, alerting the authorities, in the absence of a clear target or

---

*No. 1 v. Children's Hosp. Med. Ctr.,* 469 Mass. 710, 714, 16 N.E.3d 1044 (2014) (mentioning but not discussing the *Third Restatement* § 41). Connecticut's Appellate Court also noted the *Third Restatement*'s development, while declining to embrace it absent adoption by that state's Supreme Court. *Cannizzaro v. Marinyak,* 139 Conn. App. 722, 734, 57 A.3d 830 (2012), *aff'd on other grounds,* 312 Conn. 361, 93 A.3d 584 (2014).

[6] It is worth emphasizing that the mentally ill constitute a part of, not simply a threat to, our public body.

*Volk (Beverly R.) et al. v. DeMeerleer (James B.) et al.*
(Wiggins, J., dissenting)

imminent threat by the patient, hardly assists in the prevention of harm (while breaching patient confidentiality). *See* Br. of Amicus Curiae of Wash. State Med. Ass'n et al. at 14. Third, the risk of involuntary commitment on the one hand and a weakened confidentiality shield on the other hand may actively discourage the mentally ill from seeking treatment. It seems contrary to the public interest to transform therapy sessions into a doorway to involuntary commitment; chilling treatment harms, rather than protects, the public body.[7]

Thus, while I would decline to consider a medical negligence case divorced from the comprehensive medical malpractice framework, I would also require that the ability to control be first established before imposing a duty to control the acts of others to protect third parties.

IV.   Conclusion

While I agree that Volk failed to present a viable medical malpractice claim, I disagree with the majority's conclusion that any mental health professional's relationship with a patient gives rise to a general duty to protect third parties from harm by those patients. This is a substantial and unheralded departure from our previous case law and from the *Second Restatement*. Like the majority, I would reverse the Court of Appeals and reject the medical malpractice claim. However, I would affirm

---

[7] When the legislature cabined *Petersen* in RCW 71.05.120, it emphasized the importance of balancing both public safety and patient privacy. As a result, designated crisis responders, tasked with reviewing patients for potential involuntary commitment, are required to take reasonable precautions in case of violent behavior only where there is "an actual threat of physical violence against a reasonably identifiable victim." RCW 71.05.120(3).

10

*Volk (Beverly R.) et al. v. DeMeerleer (James B.) et al.*
(Wiggins, J., dissenting)

the trial court's grant of summary judgment in favor of Ashby and the Spokane

Psychiatric Clinic on all issues, and thus respectfully dissent.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Volk (Beverly R.) et al. v. DeMeerleer (James B.) et al.*
(Wiggins, J., dissenting)

_____
Wiggins, J.

Owens, J.

Madsen, C.J.